Quarles & Brady LLP
Firm State Bar No. 00443100
Lauren Elliott Stine (#025083)
Renaissance One
Two North Central Avenue
Phoenix, Arizona 85004-2391
TELEPHONE 602.229.5200
lauren.stine@quarles.com

MAYER BROWN LLP
(Admitted Pro Hac Vice)
Lucia Nale (Ill. Bar No. 6201684)
Thomas V. Panoff (Ill. Bar No. 6283695)
Christopher S. Comstock (Ill. Bar No. 6299333)
71 South Wacker Drive
Chicago, IL 60606
Telephone: (312) 782-0600
Facsimile (312) 701-7711
lnale@mayerbrown.com
tpanoff@mayerbrown.com
ccomstock@mayerbrown.com

*Attorneys for Defendants CitiMortgage, Inc.
And CR Title Services, Inc.*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| David A. Kester, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CitiMortgage, Inc.; CR Title Services, Inc.; and Does 1 to 25, inclusive,<br><br>Defendants. | Case No. 2:15-cv-00365-DLR<br><br>(Formerly Maricopa County Superior Court CV2014-014330)<br><br>**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>(Assigned to Hon. Douglas L. Rayes)<br><br>**(Oral Argument Requested)** |

Pursuant to Federal Rule of Civil Procedure 56(c) and Local Rule of Civil Procedure 56.1, Defendants CitiMortgage, Inc. ("CitiMortgage") and CR Title Services,

Inc. ("CR Title" and collectively, "Defendants")[1] hereby move for summary judgment with respect to Plaintiff David A. Kester's ("Plaintiff") Second Amended Class Action Complaint [Dkt. # 58] ("SAC"). This Motion is supported by the following Memorandum of Points and Authorities, Defendants' Statement of Facts ("SOF"), and supporting exhibits, all of which are filed herewith.[2]

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.  INTRODUCTION**

This case can be resolved at the summary judgment stage because Plaintiff's single cause of action turns on one dispositive issue: Did Defendants know or have reason to know that two documents related to Plaintiff's mortgage loan were allegedly "invalid" when the documents were recorded on December 17, 2010 due to the alleged revocation of a notary's commission eleven days prior? The undisputed facts establish that the answer to that question is "no." Defendants did not have the requisite knowledge of the revocation until at least a month after the documents were recorded. Moreover, there is no reason to believe Defendants had "reason to know" prior to December 17, 2017. There were no laws, regulations, or industry standards or practices in place in December 2010 that would have required Defendants to take the steps Plaintiff suggests they should have taken to try to gain that knowledge.

---

[1] After this case was filed, Defendant CR Title Services, Inc. merged with another entity, CFNA Receivables (TX), LLC. *See* Amended Corporate Disclosure Statement [Dkt. # 59]. For simplicity, the entity at issue is referred to herein as "CR Title."

[2] This case was removed to federal court in 2015, so the Court entered a Scheduling Order following the form for cases filed prior to May 1, 2017. *See* Scheduling Order [Dkt. # 57]. Under this form, the movant is required to file a separate Statement of Facts. *Id.* at ¶ 8(c). Defendants are filing a separate Statement of Facts herewith, rather than incorporating the facts into the Motion (as required for cases filed after May 1, 2017).

On December 16, 2010, Kristen Lindner notarized the two documents at issue in this Motion related to Plaintiff's mortgage loan. SAC ¶ 17.³ The documents were publicly recorded with the Maricopa County Recorder on December 17, 2010. SOF ¶ 12. About ten days earlier, on December 6, 2010, the Arizona Secretary of State had sent a letter to Lindner that purported to revoke her notary commission. *Id.* ¶ 20. Plaintiff alleges that Defendants knew or should have known of the revocation of Lindner's commission on December 17, 2010 and thus knew or should have known the documents were "invalid." SAC ¶¶ 17, 25-29. According to Plaintiff, Defendants violated A.R.S. § 33-420(A), which prohibits a "person purporting to claim an interest in, or a lien or encumbrance against, real property" from causing "a document asserting such claim" to be recorded when the person "know[s] or ha[s] reason to know that the document is . . . invalid . . ." SAC ¶¶ 17, 25-29.

However, the undisputed facts prove that neither Lindner nor either Defendant received the December 6, 2010 letter. SOF ¶¶ 22-23. Instead, over a month later, on January 14, 2011, the letter was returned to the Secretary of State's office marked as undelivered. *Id.* ¶ 24. The Secretary of State sent a new letter to Lindner's business address on January 14, 2011. *Id.* ¶ 25. The January 14, 2011 letter did not state that Lindner's commission had been revoked in December 2010 and did not state that the revocation was retroactive back to December 2010. *Id.* ¶ 27. Instead, the January 14, 2011 letter stated that the Secretary of State revoked Lindner's commission "effective immediately." *Id.*

---

³ In a prior appeal in this case, a panel of the Ninth Circuit ruled that a third document—a Notice of Trustee's Sale—would not have been rendered invalid by an allegedly defective notarization. *Kester v. CitiMortgage, Inc.*, 709 F. App'x. 869, 875 (9th Cir. 2017). Therefore, only the other two documents—the Assignment of Deed of Trust and the Substitution of Trustee—remain at issue. *See also* Plaintiff's Corrected Opposition to Defendant CR Title Service Inc.'s Motion for Judgment on the Pleadings Pursuant to Fed. R. Civ. P. 12(c) [Dkt. # 66], at p. 5 (conceding that Notice of Trustee's Sale is "no longer at issue in this case as a result of the Ninth Circuit's decision . . .").

Neither Lindner nor either Defendant knew or had reason to know of the revocation of her notary commission on December 17, 2010, when the two documents at issue were recorded. *Id.* ¶¶ 22-23. And thus neither Defendant violated A.R.S. § 33-420(A) by recording a document that they knew or had reason to know was invalid, nor was such a violation even possible given the timing described herein. Thus, as explained in more detail below, Plaintiff's statutory cause of action, the only claim at issue in this case, fails as a matter of law. The Court should therefore grant summary judgment for Defendants.

## II.  UNDISPUTED FACTS AND BACKGROUND

### A. Plaintiff's loan and default

On or around June 7, 2007, Plaintiff and his wife took out a loan from ABN AMRO Mortgage Group, Inc. ("AAMG") in the amount of $664,000.00. SOF ¶ 1. The terms of the loan were set forth in a Note. *Id.* ¶ 2. The loan was secured by a Deed of Trust, which granted AAMG a security interest in real property located at 3773 E. Nolan Dr., Chandler, Arizona 85249 ("Property"). *Id.* ¶ 3. The Deed of Trust designated First American Title Insurance Co. ("First American") as the Trustee. *Id.* ¶ 4. On September 1, 2007, AAMG merged into CitiMortgage. *Id.* ¶ 5.

Beginning in or around September 2010, Plaintiff defaulted on his required payments under the loan. *Id.* ¶ 6. On December 16, 2010, Lisa Markham, an Assistant Vice President for CitiMortgage, executed two documents related to the Property. *Id.* ¶ 7. The first document is an Assignment of Deed of Trust, which provided notice of the assignment of AAMG's interest in the Deed of Trust to CitiMortgage. *Id.* ¶ 8. The second document is a Substitution of Trustee, which substituted CR Title in place of First American as the Trustee. *Id.* ¶ 9. Both of these documents were notarized by Lindner on December 16, 2010. *Id.* ¶ 11. On the next day, December 17, 2010, the two documents were publicly recorded with the Maricopa County Recorder. *Id.* ¶ 12.

### B. Lindner's notary commission

In August 2010, an individual named Ryan Safar submitted a Statement of Complaint to the office of the Arizona Secretary of State regarding Lindner's notarization of certain documents related to Safar's mortgage loan. SOF ¶ 13. On September 29, 2010, the Arizona Attorney General's office informed Lindner of the complaint in a letter to Lindner requesting that she provide a written response to the complaint and a copy of her notary journal for April 2, 2010. *Id.* ¶ 14. On or about September 29, 2010, Lindner advised her manager that a complaint was lodged against her as a notary public. *Id.* ¶ 15.

On October 11, 2010, Lindner sent to the Arizona Attorney General's office a letter responding to the complaint and attached a copy of her notary journal for the date of April 2, 2010. *Id.* ¶ 16. On November 3, 2010, the Arizona Attorney General's office sent a letter to Lindner stating that the office had not received a response to their letter of September 29, 2010 and asking her to provide her response. *Id.* ¶ 17. On November 23, 2010, Lindner emailed Shawn Stanford, a Legal Assistant with the Attorney General's office, and explained that she had previously sent a response letter to the Attorney General on October 11, 2010. *Id.* ¶ 18. Later in the day on November 23, 2010, Stanford emailed Lindner back and explained that the Arizona Attorney General's office had, in fact, received the submission she sent on October 11, 2010. *Id.* ¶ 19.

On December 6, 2010, the Arizona Secretary of State's office mailed a letter to Lindner stating that the Secretary of State had decided to revoke her notary commission and that she had 30 days, or until January 6, 2011, to file a written notice of appeal. *Id.* ¶ 20. Copies of the letter were sent to the office of the Arizona Attorney General and to Safar, but no copies were sent to either of the Defendants. *Id.* ¶ 21. Neither Lindner nor either of the Defendants received the letter sent by the Arizona Secretary of State's office on December 6, 2010. *Id.* ¶¶ 22-23. Accordingly, on December 17, 2010, when the documents relating to Plaintiff's mortgage loan were recorded with the Maricopa County

1  Recorder, neither Lindner nor either of the Defendants knew that the Arizona Secretary of State had decided to revoke Lindner's notary commission. *Id.*

On January 14, 2011, the letter that was sent to Lindner on December 6, 2010 was returned to the Arizona Secretary of State's office through the United States mails and was marked "UNCLAIMED – UNABLE TO FORWARD." *Id.* ¶ 24. On the same day, January 14, 2011, the Arizona Secretary of State's office sent a new letter to Lindner's business address. *Id.* ¶ 25. Like the undelivered December 6, 2010 letter, the January 14, 2011 letter stated that the Secretary of State had determined to revoke Lindner's commission "effective immediately." *Id.* ¶ 27. The January 14, 2011 letter did not state that Lindner's commission had been revoked in December 2010 and did not state that the revocation decision was retroactive back to December 2010. *Id.* The January 14, 2011 letter—like the undelivered December 6, 2010 letter—stated that Lindner had 30 days, or until February 14, 2011, to file a written notice of appeal. *Id.* ¶ 26. On January 24, 2011, the Arizona Secretary of State's office received a receipt for the letter sent on January 14, 2011. *Id.* ¶ 28. The receipt showed that the January 14, 2011 letter had been signed for by Scott Selph on January 18, 2011. *Id.*

**C. Procedural history**

Plaintiff filed his initial complaint against Defendants in the Superior Court of Maricopa County on or around December 8, 2014. Notice of Removal, Exhibit A [Dkt. # 1-1]. He filed an amended complaint in the same court on or around January 27, 2015. *Id.* Plaintiff's amended complaint raised one cause of action under A.R.S. § 33-420(A). *Id.* In support of that claim, Plaintiff alleged that Defendants had recorded documents they knew or should have known were notarized by Lindner after the Secretary of State had revoked her notary commission. *Id.* On February 27, 2015, Defendants removed the case to the U.S. District Court for the District of Arizona. Notice of Removal [Dkt. # 1].

Defendants moved to dismiss on April 20, 2015. Motion to Dismiss [Dkt. # 16]. On March 31, 2016, Judge Wake dismissed the case in its entirety and with prejudice. Order [Dkt. # 37]. Judge Wake held that the allegedly defective notarizations were immaterial to Plaintiff and that any defects in the documents had been cured by operation of A.R.S. § 33-411(C) and A.R.S. § 33-811(B). *Id.* at 6-17. Judge Wake also opined that "it is unlikely that the Defendant corporations knew on December 16 of revocation of the notary's commission on December 6." *Id.* at 18. In addition, he rejected "Plaintiff's theory that the notary's own knowledge of her revocation may be 'imputed' to Defendants under agency law principles" because "[t]he Arizona Supreme Court expressly foreclosed this sort of theory with respect to the knowledge requirement under A.R.S. §33-420(A)." *Id.* (citing *Wyatt v. Wehmueller*, 167 Ariz. 281, 285, 806 P.2d 870, 874 (1991)).

Plaintiff appealed to the Ninth Circuit, and, on September 29, 2017, a split panel voted 2-1 to reverse and remand the case. *Kester*, 709 F. App'x. at 875.[4] The panel majority held that a plaintiff need not show that a defect is material to state a claim under the "invalid" prong of A.R.S. § 33-420(A) and that any defects in the documents were not cured by operation of A.R.S. § 33-411(C) or A.R.S. § 33-811(B). *Id.* at 874-75.

On April 4, 2018, Judge Wake recused himself, and the case was reassigned to this Court. [Dkt. # 44]. On June 4, 2018, Plaintiff filed the SAC. In the SAC—as in the prior versions of the complaint—Plaintiff alleges that Defendants recorded the Assignment of Deed of Trust and Substitution of Trustee while they knew or had reason to know the documents were "invalid" because Lindner had notarized the documents after her notary commission had been revoked. SAC ¶ 17. Plaintiff argues that, by recording the documents, Defendants violated A.R.S. § 33-420(A), which prohibits recording a

---

[4] Defendants disagree with the Ninth's Circuit's ruling, including on the issue of invalidity, and reserve any and all rights to challenge the ruling on a further appeal.

document while "knowing or having reason to know that the document is . . . invalid . . ." *Id.* ¶ 26-27.[5]  Plaintiff is seeking statutory damages. *Id.* at p. 9.[6]

On May 11, 2018, the Court entered a Scheduling Order in the case. [Dkt. # 57]. Pursuant to the Scheduling Order, the parties completed fact discovery on November 19, 2018. *Id.* ¶ 5. On January 14, 2019, Plaintiff served Defendants with a report from his expert, Christopher Wyatt. SOF ¶ 30. On February 18, 2019, Defendants served Plaintiff with an expert report from their expert, Lisa Murphy. *Id.* ¶ 31. Both experts were deposed prior to the scheduled close of expert discovery on March 25, 2019. *Id.* ¶ 32.

## III. STANDARD OF REVIEW

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. "Summary judgment may also be entered 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Lewis v. Dirt Sports LLC*, 259 F. Supp. 3d 1039, 1042 (D. Ariz. 2017) (Rayes, J.) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). "The party seeking summary judgment 'bears the initial

---

[5] Plaintiff does not allege the documents at issue were "forged" or "groundless" or that they contained any "material misstatement." SOF ¶ 29. Instead, he alleges only that the documents were "otherwise invalid." *Id.*

[6] The SAC alleges that Plaintiff is seeking to certify a class of "property owners or beneficial title holders" whose properties were "the subject of recordations" notarized "by employees of Defendants at a time when their Notary Licenses had been revoked or suspended." SAC ¶ 19-24. Plaintiff filed a Motion for Class Certification on October 31, 2018. [Dkt. # 68]. Defendants filed an Opposition [Dkt. # 71] on November 14, 2018, and Plaintiff filed a Reply [Dkt. # 81] on November 21, 2018. On November 27, 2018, Defendants filed an Unopposed Motion for Leave to File a Sur-Reply [Dkt. # 82] and a Proposed Sur-Reply [Dkt. # 83] to address new evidence raised for the first time in Plaintiff's Reply. On December 10, 2018, the Court granted Defendants' Unopposed Motion [Dkt. # 84] and the Sur-Reply was filed with the Court [Dkt. # 85]. Plaintiff's Class Certification Motion currently is pending. However, if the Court grants summary judgment for Defendants, it need not address the motion and can instead deny it as moot.

responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact.'" *Id.* "The burden then shifts to the non-movant to establish the existence of a genuine and material factual dispute." *Id.*

"The non-movant 'must do more than simply show that there is some metaphysical doubt as to the material facts,' and instead 'come forward with specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). "Substantive law determines which facts are material and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "Conclusory allegations, unsupported by factual material, are insufficient to defeat summary judgment." *Id.* (citing *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1986)).

## IV.  ARGUMENT

Plaintiff's only cause of action in this case is brought under A.R.S. § 33-420(A), which prohibits a party from recording a document when the party "know[s] or ha[s] reason to know" the document is "invalid." SAC ¶¶ 25-29. Plaintiff alleges that Defendants recorded the Assignment of Deed of Trust and Substitution of Trustee while knowing or having reason to know they were allegedly "invalid." *Id.* ¶¶ 17, 27-28.

"The purpose of § 33-420 is to protect property owners from actions clouding title to their property." *Bergdale v. Quality Loan Service Corp.*, 2017 WL 373014, at *2 (D. Ariz. Jan. 26, 2017) (quoting *Wyatt v. Wehmueller*, 167 Ariz. 281, 286 (1991)). "The statute achieves this purpose by proscribing the recording of various types of invalid property claims." *Id.* A plaintiff claiming that a document is "invalid" under A.R.S. § 33-420 must show that: "(1) the document is invalid and (2) the defendant knew or should

have known this." *Id.* (citing *Delmastro & Eells v. Taco Bell Corp.*, 228 Ariz. 134, 142 ¶ 27 (App. 2011)).

As shown below, neither Defendant knew that the documents at issue were allegedly "invalid" when the documents were recorded on December 17, 2010 because the earliest that either Defendant was aware of the revocation was at least a month after the documents were recorded. Moreover, there is no reason to believe Defendants had "reason to know" prior to December 17, 2017 because there were no laws, regulations, or industry standards or practices in place in December 2010 that required Defendants to take the steps Plaintiff suggests they could have taken to try to gain that knowledge. Accordingly, Plaintiff's claim under A.R.S. §33-420(A) fails as a matter of law. *See, e.g.*, *Bergdale*, 2017 WL 373014, at *3 (granting summary judgment for defendant on plaintiff's claim under A.R.S. § 33-420(A) where plaintiff could not show that defendant knew or had reason to know that recorded document was invalid).

**A. Defendants did not know the documents were allegedly "invalid" when they were recorded.**

The undisputed facts establish that neither Defendant knew—nor could have known—that the Arizona Secretary of State had decided to revoke Lindner's notary commission when the documents were recorded on December 17, 2010.

The Secretary of State's office sent a letter to Lindner on December 6, 2010, which stated that the Secretary of State had decided to revoke her notary commission. SOF ¶ 20. However, the Secretary of State's records definitively establish that neither Defendant was copied on this letter. *Id.* ¶ 21. Furthermore, neither Lindner nor either Defendant actually received this letter. *Id.* ¶¶ 22-23. Instead, the letter was returned to the Secretary of State's office through the mail on January 14, 2011 and was marked as undelivered. *Id.* ¶ 24. The Secretary of State's office then sent a new letter to Lindner's business address, which was received on January 18, 2011. *Id.* ¶¶ 25-28.

Plaintiff's expert, Christopher Wyatt, did not offer any opinion in his report that either Defendant had actual knowledge of the revocation prior to December 17, 2010. *Id.* ¶ 33. He also confirmed in his deposition that he had no reason to believe that either Defendant had actual knowledge when the documents were recorded. *Id.* ¶¶ 25-28.

Accordingly, the undisputed evidence definitively establishes that neither Defendant knew that the Secretary of State revoked Lindner's notary commission when the documents were recorded on December 17, 2010, and, therefore, neither Defendant knew the documents were allegedly "invalid" when they were recorded. Summary judgment is thus appropriate as to the issue of Defendants' knowledge. *See, e.g.*, *F.T.C. v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1139 (9th Cir. 2010) (explaining that a court may grant summary judgment with respect to issues such as "whether a party knew or should have known of a particular condition" when the facts are undisputed and no "contradictory inferences" can be drawn from such facts) (quoting *Baxton-Secret v. A.H. Robins Co.*, 769 F.2d 528, 531 (9th Cir. 1985)).

**B. Defendants did not have reason to know the documents were allegedly "invalid" when they were recorded.**

Perhaps recognizing the lack of actual knowledge, Plaintiff and his expert have suggested three arguments in support of their contention that Defendants had "reason to know" by December 17, 2010 that the Secretary of State revoked Lindner's notary commission. First, Plaintiff has argued that Lindner's knowledge should be imputed to Defendants. Second, Plaintiff and his expert have suggested that Defendants should have prevented Lindner from notarizing documents as of September 2010, when Lindner's manager learned of the complaint filed against her. And finally, Plaintiff and his expert have suggested that Defendants should have independently validated the status of Lindner's notary commission with the Secretary of State at some point in the 11-day period between December 6, 2010 and December 17, 2010.

As explained below, none of these arguments support the conclusion that Defendants had reason to know about the revocation.

> *1. Lindner did not have notice of the December 6, 2010 letter, so her knowledge cannot be imputed to Defendants.*

In his Opposition to Defendants' initial Motion to Dismiss, Plaintiff argued that "Defendants had imputed notice" of the December 6, 2010 letter from the Arizona Secretary of State because the letter was sent to Lindner who was "their employee and agent." Opp. to MTD [Dkt. # 17] at 9. Subsequent discovery in this case conclusively disproved this argument. As shown by the Secretary of State's records, which were authenticated and verified by that office in discovery, the December 6, 2010 letter was not delivered to Lindner. SOF ¶¶ 22-24. Instead, it was returned to the Secretary of State's office on January 14, 2011 and marked as undelivered. *Id.* Therefore, Lindner did not have knowledge of the Secretary of State's decision to revoke her notary commission when the documents were recorded on December 17, 2010. Lindner thus did not have any knowledge that could be "imputed" to Defendants.[7]

> *2. Defendants were not required to prevent Lindner from notarizing documents when her manager learned of the complaint filed against her.*

In his Class Certification Motion, Plaintiff suggested that Defendants should have suspended Lindner or otherwise prevented her from notarizing documents after they learned in September 2010 that a complaint had been filed with the Arizona Secretary of State regarding Lindner's notarization of documents. Class Cert. Mot. [Dkt. # 68] at 3, 7.

But, under Arizona law, Lindner was allowed to continue to notarize documents after the complaint was filed and while the investigation was proceeding. A notary "shall

---

[7] Even if Lindner had knowledge of the Secretary of State's decision on December 17, 2010, that knowledge could not be "imputed" to Defendants because, as Judge Wake recognized in his Order granting the Motion to Dismiss, "[t]he Arizona Supreme Court expressly foreclosed this sort of theory with respect to the knowledge requirement under A.R.S. § 33-420(A)." Order [Dkt. # 37] (citing *Wyatt*, 167 Ariz. at 285).

1  continue to serve until the notary public's commission expires, the notary public resigns
2  the commission, the notary public dies or the secretary of state *revokes the commission*."
3  A.R.S. §41-312(D) (emphasis added). And the September 29, 2010 letter to Lindner from
4  the Arizona Attorney General did not ask her to cease notarizing documents or to take any
5  action other than providing a written response to the complaint and a copy of her notary
6  journal for the date in question. SOF ¶ 14. Indeed, it would be entirely impractical to
7  require a notary to cease notarizing documents whenever a complaint is filed because,
8  under Arizona law, "[a]ny person may make a complaint to the office of the secretary of
9  state regarding a notary public." A.R.S. § 41-331(a). Thus, there is no reason to believe a
10 complaint will necessarily result in any adverse finding or action taken against the notary.

11   In his expert report, Plaintiff's expert, Christopher Wyatt, opined that, under
12 "reasonably prudent industry standards," Defendants "should have discontinued allowing
13 . . . Lindner to notarize any documents until a final decision was made in connection with
14 the pending complaint . . ." SOF ¶ 35. However, Wyatt does not cite any source for these
15 supposed "reasonably prudent industry standards." He does not identify any specific
16 laws, regulations, or industry standards or practices suggesting that Defendants should
17 have prevented Lindner from notarizing documents after her manager received notice of
18 the complaint against her.

19   At his deposition, Wyatt conceded that he is not aware of any particular law,
20 regulation, or industry standard or practice requiring Defendants to prevent Lindner from
21 notarizing documents after they learned that a complaint had been filed against her. *Id.*
22 ¶ 36. Wyatt further conceded that he is not aware of any other mortgage servicer who had
23 a policy to prevent an employee from notarizing documents after receiving notice of a
24 complaint. *Id.* ¶ 37. And he is not aware of any instance of a mortgage servicer actually
25 preventing a notary from notarizing documents after learning of a complaint. *Id.*[8]

---

[8]  Likewise, Defendants' expert, Lisa Murphy, opined in her report that she is not aware of any requirement or standard in existence at any time—including in December

Accordingly, Wyatt's opinion that Defendants should have prevented Lindner from notarizing documents does not reflect any "industry standards" or "practices" but instead reflects only Wyatt's unsupported, subjective speculation.

For purposes of this Summary Judgment Motion, the Court should disregard Wyatt's opinion that Defendants should have prevented Lindner from notarizing documents after her manager learned of the complaint against her. Under Federal Rule of Evidence 702, an expert qualified by "knowledge, skill, experience, training, or education" may offer testimony only if: (a) the expert's knowledge will help the trier of fact to understand the evidence or to determine a fact in issue, (b) the testimony is based on sufficient facts or data, (c) the testimony is the product of reliable principles and methods, and (d) the expert has reliably applied the principles and methods to the case.

Under this rule, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). It is well established that "Rule 702 requires that expert testimony relate to scientific, technical, or other specialized knowledge, which does not include unsupported speculation and subjective beliefs." *Guidroz-Brault v. Missouri Pac. R. Co.*, 254 F.3d 825, 829 (9th Cir. 2001); *Wright v. U.S.*, 2008 WL 820557, at *7 (D. Ariz. Mar. 25, 2008) ("The expert's testimony must be based on knowledge, not mere subjective belief or unsupported speculation."). "[I]n the context of a motion for summary judgment, an expert must back up his opinion with specific facts." *Id.* at 831-32 (quoting *U.S. v. Various Slot Machines on Guam*, 658 F.2d 697, 700 (9th Cir. 1981)).

Here, Wyatt offers no "specific facts" to support his "subjective belief" that Defendants should have prevented Lindner from notarizing documents in September 2010, when her manager learned of the complaint against her. Wyatt points to no source

2010—stating that an employer should prevent a notary from notarizing documents whenever the employer learns of a complaint against the notary. SOF ¶ 38.

of authority, no written guidance, no industry custom, and not even one example of another mortgage servicer taking similar action. The Court should therefore disregard Wyatt's unreliable opinion on this issue. Without Wyatt's unsupported opinion, there is no support in the record for the proposition that Defendants should have prevented Lindner from notarizing documents beginning in September 2010.

> *3. Defendants were not required to independently validate the status of Lindner's notary commission between December 6, 2010 and December 17, 2010.*

In his report, Plaintiff's expert, Wyatt, suggests that Defendants should have independently validated the status of Lindner's notary commission with the Secretary of State, rather than waiting to hear back regarding the outcome of the investigation. SOF ¶ 39. Wyatt suggests that Defendants should have independently validated the status of Lindner's commission either by checking the Secretary of State's website or calling the office of the Secretary of State. *Id.* However, Wyatt again does not cite any particular law, regulation or industry standard or practice—in effect at any time—that required Defendants to independently validate the status of a notary's commission rather than wait to be informed by state officials about the results of the investigation.

Wyatt's report also fails to explain how often he believes Defendants should have performed this independent validation. *Id.* ¶ 40. Wyatt states that, by June 2013—nearly three years after the period at issue—Defendants had in place written policies that required them to validate the status of a notary's commission once a month. *Id.* However, Wyatt has not identified any policy of Defendants in effect in December 2010 that would have required them to validate Lindner's commission once a month. *Id.*

In any event, because the Secretary of State sent the revocation letter on December 6, 2010 and the documents at issue were recorded on December 17, 2010, Wyatt apparently believes Defendants should have independently validated the status of Lindner's notary commission at some point in the 11-day period between December 6,

1  2010 and December 17, 2010.  A monthly validation period would not necessarily have
2  sufficed under this standard unless the date of the validation happened to fall between the
3  6th and 17th of the month.  Accordingly, Wyatt is advocating for a standard requiring an
4  employer to validate a notary's commission at least once a week, if not every day.

5  Once again, Wyatt does not identify any specific laws, regulations or industry
6  standards or practices suggesting that Defendants should have validated the status of
7  Lindner's commission more frequently than once a month.  At his deposition, Wyatt
8  conceded that he is not aware of any particular law, regulation, or industry standard or
9  practice suggesting that Defendants should have validated the status of Lindner's notary
10 commission more frequently than once per month.  *Id.* ¶ 41.  Wyatt further conceded that
11 he is not aware of any other mortgage servicer who had a policy or procedure of
12 validating a notary's commission with a greater-than-monthly frequency.  *Id.* ¶ 42.  And
13 he is not aware of any mortgage servicer actually validating the status of a notary's
14 commission on a weekly or daily basis.  *Id.*[9]  Instead, Wyatt opined that the servicers that
15 he worked for validated the status of their notaries' commissions once a month.  *Id.*
16 Accordingly, Wyatt's opinion that Defendants should have prevented Lindner from
17 notarizing documents does not reflect any "industry standards" or "practices" but instead
18 reflects only Wyatt's own unsupported, subjective personal opinion.

19 But even if there were such a requirement (which Wyatt could not cite), the more
20 fundamental—and fatal—flaw with Wyatt's position is that he conceded at his deposition
21 that he does not know whether the Secretary of State's website was updated between
22 December 6, 2010 and December 17, 2010 to reflect that the Secretary of State revoked
23 Lindner's notary commission.  *Id.* ¶ 44.  He also conceded that he is not aware of how

---

[9] Likewise, Defendants' expert, Lisa Murphy, opined in her report that she is not aware of any requirement or standard in December 2010 suggesting that an employer should have independently validated the status of a notary's commission, much less that they should have done so on a weekly or daily basis.  SOF ¶ 43.

frequently the Secretary of State's office updated their own internal records in December 2010 to reflect the revocation of a notary's commission. *Id.* Wyatt thus cannot say whether or not it was even possible for Defendants to determine whether Lindner's commission had been revoked by contacting the Secretary of State's office between December 6, 2010 and December 17, 2010, even if there were a law, regulation or standard or practice requiring such an inquiry (which Wyatt again could not cite).[10]

Furthermore, the September 29, 2010 letter to Lindner from the Arizona Attorney General did not instruct her to independently check the status of her notary commission or to ask her employer to do the same. *Id.* ¶ 14. Wyatt's assertion that Defendants should have validated the status of her notary commission at a frequency that would have allowed them to learn that the Secretary of State had decided to revoke the commission at some point between December 6, 2010 and December 17, 2010 reflects only his own "subjective belief" and "unsupported speculation." *Guidroz-Brault*, 254 F.3d at 829. The Court should thus disregard Wyatt's opinion on this point for purposes of summary judgment. Without Wyatt's unsupported opinion, there is no support in the record for the proposition that Defendants should have independently validated the status of Lindner's commission at some point in the 11-day period between December 6, 2010 and December

---

[10] In his report, Wyatt relies on a Declaration signed by Gregory Waxman, a private investigator. SOF ¶ 45. Waxman's Declaration states that, in January 2019, he spoke to Diana Ogaz, who is currently the Notary Complaint Coordinator for the Arizona Secretary of State. *Id.* ¶ 46. Ogaz allegedly informed Waxman that the Secretary of State's website is updated to reflect the revocation of a notary's commission and that the "procedure for updating the website is the same today as it was in December of 2010." *Id.* However, the Declaration does not state how frequently the Secretary of State's office updates its website after revoking a notary's commission and does not state when the website was updated to reflect the revocation of Lindner's commission. *Id.* ¶ 47. Moreover, Wyatt admitted at his deposition that he did nothing to verify the reliability of Waxman or of Waxman's declaration. *Id.* ¶ 48. Wyatt also does not know whether Ogaz worked for the Secretary of State's office in any capacity in December 2010. *Id.* Accordingly, Waxman's Declaration offers no support for the proposition that Defendants would have been able to independently verified the status of Lindner's commission.

17, 2010 or for the proposition that such a validation would have necessarily resulted in Defendants learning that the Secretary of State had revoked Lindner's notary commission.

The undisputed facts establish Defendants did not know or have reason to know that the two documents at issue were allegedly "invalid" when they were recorded. This disposes of Plaintiff's A.R.S. § 33-420(A) claim, the only cause of action in this case.

## V. CONCLUSION

For the reasons stated above and in the Statement of Facts and supporting exhibits, the Court should grant summary judgment for Defendants.

RESPECTFULLY SUBMITTED this 8th day of April, 2019.

By /s/ *Lauren Elliott Stine*
Lauren Elliott Stine

QUARLES & BRADY LLP
Lauren Elliott Stine (#025083)
Renaissance One
Two North Central Avenue
Phoenix, Arizona 85004

MAYER BROWN LLP
(Admitted Pro Hac Vice)
Lucia Nale (Ill. Bar No. 6201684)
Thomas V. Panoff (Ill. Bar No. 6283695)
Christopher S. Comstock (Ill. Bar No. 6299333)
71 South Wacker Drive
Chicago, Illinois 60606

*Attorneys for Defendants CitiMortgage, Inc.
And CR Title Services, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 8, 2019, I electronically transmitted the attached document to the Clerk's Office using the ECF System for filing. The system will provide notice of filing to counsel for all parties of record.

/s/ Maria Marotta