Andrew S. Friedman, Esq. (005425)
**BONNETT FAIRBOURN FRIEDMAN**
  **& BALINT, P.C.**
2325 East Camelback Road, Suite 300
Phoenix, Arizona 85016
afriedman@bffb.com
Telephone: (602) 274-1100

Patricia N. Syverson, Esq.  (020191)
**BONNETT FAIRBOURN FRIEDMAN**
  **& BALINT, P.C.**
600 W. Broadway, Suite 900
San Diego, CA 92101
psyverson@bffb.com
Telephone: (602) 274-1100

David N. Lake (*admitted pro hac vice*)
**LAW OFFICES OF DAVID N. LAKE,**
  **A Professional Corporation**
16130 Ventura Boulevard, Suite 650
Encino, California 91436
david@lakelawpc.com
Telephone: (818) 788-5100

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| David A. Kester, on behalf of himself and all others similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>CitiMortgage, INC.; CR Title Services, Inc.; and Does 1 to 25, inclusive<br><br>    Defendants. | Case No. CV-15-00365-PHX- DLR<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>**(Oral Argument Requested)**<br><br>Assigned to Judge: Hon. Douglas L. Rayes |

Plaintiff David A. Kester ("Plaintiff") respectfully opposes Defendants CitiMortgage, Inc. and CR Title Services, Inc.'s (collectively, "CitiMortgage") Motion for Summary Judgment ([Doc. 103], the "Motion") because there are disputed factual questions at the core of this matter, namely whether CitiMortgage knew or had reason to know that the documents notarized by its employee, Kristen Lindner, after her notary commission had been revoked were invalid within the meaning of A.R.S. § 33-420(A). These genuine issues of disputed fact preclude summary judgment. *Braxton–Secret v. A.H. Robins Co.*, 769 F.2d 528, 531 (9th Cir. 1985) ("Questions involving a person's state of mind, e.g., whether a party knew or should have known of a particular condition, are generally factual issues inappropriate for resolution by summary judgment.") (internal citations omitted). Plaintiff's opposition is supported by the declaration of Andrew S. Friedman, Plaintiff's Counterstatement of Material Facts in Response to Defendant's Statement of Facts ("PCF"), the following Memorandum of Points and Authorities, and the Court's case file.

## I.   INTRODUCTION

A.R.S. § 33-420(A) prohibits a "person purporting to claim an interest in, or a lien or encumbrance against, real property" from causing "a document asserting such claim" to be recorded when the person "know[s] or ha[s] reason to know that the document is . . . invalid . . .." Plaintiff contends that CitiMortgage violated this express statutory prohibition when, on December 17, 2010, CitiMortgage recorded certain qualifying documents claiming an interest in real property owned by Plaintiff – an Assignment of Deed of Trust and a Substitution of Trustee ("the Recorded Documents") – despite knowing or having reason to know they were invalid. For purposes of the Motion, CitiMortgage effectively concedes that every element of a statutory claim under A.R.S. § 33-420(A) is satisfied save one: the inherently fact driven question of whether CitiMortgage "knew or had reason to know" that the Recorded Documents were invalid. Thus, as framed by the Motion, the sole question before the Court is whether under the record presented there remains any genuine

1

1  disputed factual issue about what CitiMortgage knew or had reason to know with regard to

2  Ms. Lindner's notary commission and actions as they relate to the Recorded Documents.

3  If there is a disputed factual issue then the Motion must be denied – and there certainly is

4  such an issue here.

5       CitiMortgage's Motion rests on the incorrect factual and unsupported legal premise

6  that CitiMortgage could ***only*** have known or had reason to know that the Recorded

7  Documents were invalid if a specific law or regulation required CitiMortgage to

8  independently monitor, track, follow up on, or inquire about the August 2010 complaint

9  lodged with the Arizona Attorney General against Ms. Lindner.[1] CitiMortgage contends

10  and believes that absent such a law or regulation it had no obligation whatsoever to stay

11  informed and, therefore, no reason to know and, as such, it could blithely continue having

12  Ms. Lindner notarize documents, including the Recorded Documents, until such time as

13  the State of Arizona itself reached out to CitiMortgage and notified it that Ms. Lindner's

14  commission had been revoked. As shown below, the facts (including CitiMortgage's own

15  policies and procedures), both experts, and common sense show otherwise and compel

16  denial of CitiMortgage's Motion.

17  **II.   THE MATERIAL FACTS AND FAIR INFERENCES THEREFROM**

18      **A.   The Complaint Against Ms. Lindner, Relevant Documents, and**

19              **Timeline.**

20       Kristen Lindner was employed by CitiMortgage, Inc. at least from August 1, 2010

21  through April 30, 2011. PCF ¶ PC2. As part of her employment, Ms. Lindner notarized

22  documents on behalf of CitiMortgage, including from December 2010 through February

23  2011. *Id.* at ¶ PC3. On September 29, 2010, the Arizona Attorney General's Office

---

24  [1] In its Motion, CitiMortgage argues there were no laws, regulations, "industry standards,"

25  or practices requiring them to take the steps "suggested" by Plaintiff's expert, Mr. Wyatt. Doc. 103, pp. 1, 9. This argument is based on the Rebuttal Report of CitiMortgage's expert,

26  Lisa Murphy. *See* DSOF ¶¶ 31, 38, 43. However, Ms. Murphy's Rebuttal Report says nothing about practices. *Id.* at ¶ 31, Ex. T. She also confirmed in her deposition that her

27  opinions were limited to whether there were laws, regulations, regulatory requirements, or "industry standards" requiring CitiMortgage to take the steps Mr. Wyatt opined it should

28  have taken. PCF ¶ PC42.

1  ("AGO") sent Ms. Lindner a letter informing her that Ryan Safar had filed a complaint
2  against her as a notary public. *Id.* at ¶ PC7. The letter included a copy of Mr. Safar's
3  complaint alleging that Ms. Lindner notarized a Substitution of Trustee and Assignment of
4  Deed of Trust on April 2, 2010 even though the signer could not have been in Arizona to
5  sign the documents in Ms. Lindner's presence. *Id.* The letter also clearly and unequivocally
6  informed Ms. Lindner that her notary commission could be revoked if she failed to provide
7  the requested information to the AGO within 10 business days. *Id.*

8       On October 11, 2010, Ms. Lindner sent the AGO the documents it requested. *Id.* at
9  ¶ PC8. On November 23, 2010, Ms. Lindner emailed Mr. Stanford at the AGO asking
10 whether the AGO had received her October 11, 2010 letter. *Id.* at ¶ PC9. On November 23,
11 2010, Mr. Stanford confirmed receipt of Ms. Lindner's October 11, 2010 letter and advised
12 her: "You will hear from the Secretary of State's Office regarding its decision about the
13 complaint," thereby inferring that nothing further was required from Ms. Lindner and a
14 decision on the complaint against her would be issued soon. *Id.* at ¶ PC10.

15      On December 6, 2010, the Arizona Secretary of State's Office ("ASO") informed
16 Ms. Lindner that, as a result of its investigation into Mr. Safar's complaint, her notary
17 commission had been revoked "effective immediately." *Id.* at ¶ PC11; DSOF ¶ 20. A copy
18 of the ASO's letter was sent to the AGO and the "Notary File," and nothing in the record
19 indicates that this was not done immediately after the letter was issued. PCF ¶ PC11. On
20 June 9, 2011, the ASO sent Ms. Lindner a letter informing her that "[i]t has been brought
21 to the attention of the Office of the Secretary of State , that you notarized a 'Deed of Trust'
22 on January 12, 2011," and demanding she "cease notarizing immediately, as your notary
23 commission was revoked on December 6, 2010." *Id.* at ¶ PC12.

24      Despite the unequivocal revocation of her notary commission effective December
25 6, 2010, on December 16, 2010, Ms. Lindner notarized the Recorded Documents – an
26 Assignment of Deed of Trust and a Substitution of Trustee. DSOF ¶¶ 11. On December 17,
27 2010, the Recorded Documents were recorded with the Maricopa County Recorder. *Id.* at

28

¶ 12. Both documents required a proper acknowledgment. A.R.S. § 33-401(B). The Recorded Documents were "invalid" because Ms. Lindner's notary commission was revoked on December 6, 2010, prior to her acknowledgement of the documents. PCF ¶¶ PC11-12. CitiMortgage allowed Ms. Lindner to continue notarizing documents on their behalf for another three (3) months after her notary commission was revoked. *Id.* at ¶ PC38.

Ms. Linder kept a notary log of the documents she notarized on behalf of CitiMortgage. *Id.* at ¶ PC5. CitiMortgage collected copies of those notary logs weekly and maintained them. *Id.* at ¶ PC4. Ms. Lindner's notary log entries for the Recorded Documents suffer from the very same deficiencies as those identified in the December 6, 2010 letter from the Arizona Secretary of State's Office – the letter which determined that Ms. Lindner failed to clearly show that she identified the signer or that the signer was present with her for the notarization, and therefore "failed to properly perform the acknowledgment and executed a notarial certificate containing a false statement providing the Secretary grounds for suspension or revocation." *Id.* at ¶ PC6.

### B.   Policies, Practices, and Procedures in the Mortgage Servicing Industry Generally and at CitiMortgage.

Entities such as CitiMortgage typically have policies, procedures, and practices in place to help ensure compliance with applicable laws, for example, state law requirements for acknowledgements such as A.R.S. § 33-401(B). PCF ¶¶ PC14-15. Mortgage servicers also often develop policies, procedures, and practices pertaining to their own operations that are not required by or directly related to laws, regulations, or regulatory guidance or expectations, and can also have practices in place that they determine to be reasonable or prudent for their operations, or to address risks they operate under, even without an "industry standard"[2] requiring them. *Id.* at ¶ PC16.

---

[2] References in this memorandum to "industry standard[s]" in quotes refer to the term as defined by CitiMortgage's expert, Lisa Murphy. When Ms. Murphy uses the term "industry standard" she is referring solely to published, written requirements dictated by regulatory guidance or defined by someone who is responsible for the industry, primarily regulators as a standard the mortgage servicing industry is required to follow. *Id.* at ¶ PC39. When

For example, in 2010, various mortgage servicers had policies and procedures related to notaries, including monitoring notaries, checking the requirements for notaries, and regularly reviewing their commissions, including their validity and whether they were up to date. *Id.* at ¶ PC20. It was also an expectation in the industry long before 2010 that complaints against or investigations into notary employees would be brought to the attention of the notary's manager for follow up because such complaints or investigations could affect the notary's ability to do their job. *Id.* at ¶ PC19. Mortgage servicing entities, such as CitiMortgage, take such complaints seriously and would want to know whether a notary employee's commission was suspended or revoked because that employee is notarizing documents on behalf of the mortgage servicer. *Id.* at ¶ PC30.

CitiMortgage had policies and procedures in place in 2010 requiring its notaries to advise it of (a) complaints concerning notary acts performed on behalf of CitiMortgage, and (b) communications involving a challenge to a notarized document, or that concerned CitiMortgage, or the status of the notary's commission or qualifications. *Id.* at ¶ PC21-22. Significantly, CitiMortgage instituted these policies and procedures even though there was no law, regulation, or "industry standard" requiring them. *Id.* at ¶ PC23.

**C.    CitiMortgage's Policies, Practices, and Procedures and Reasonable, Prudent Industry Practices Gave CitiMortgage Knowledge or a Reason to Know the Recorded Documents Were Invalid.**

As required under CitiMortgage's policies and procedures, on September 29, 2010, Ms. Lindner advised her manager that Mr. Safar had lodged a complaint against her as a notary public with the AGO. PCF ¶ PC25; DSOF ¶ 15. Pursuant to those same policies and procedures, Ms. Lindner was required to advise CitiMortgage of her October 11, 2010

---

Plaintiff uses the term without quotation marks, he is using the broader definition applied by his expert, Christopher Wyatt. According to Mr. Wyatt, industry standards are not limited to what the law or regulations require a mortgage servicer to do. *Id.* at ¶ PC40. Once a mortgage servicer knows a complaint has been filed against one of their notaries, the reasonable and prudent practice in the industry would be to treat the complaint seriously, investigate the complaint – including the allegations and any legal requirements – and also be diligent in independently determining the status of the complaint, and whether any decisions were made by or actions taken by the Secretary of State. *Id.*

letter to the ASO and her November 23, 2010 email exchange with Mr. Stanford at the AGO. PCF ¶ PC26. Given her initial compliance with CitiMortgage's policies and procedures, it is reasonable to infer that Ms. Lindner also informed CitiMortgage about the October 11, 2010 letter and the November 23, 2010 email exchange with Mr. Stanford, and that she provided copies of the communications to CitiMortgage and/or explained the contents. *Id.*

It is also reasonable to infer that CitiMortgage knew around September 29, 2010 the nature of the complaint against its notary, that Ms. Lindner's notary commission could be revoked if she failed to provide the requested information to the AGO within 10 business days, and knew around November 23, 2010 that the investigation was complete and a decision from the ASO was coming soon. *Id.* at ¶ PC27. Because Mr. Safar's complaint identified the documents at issue, the signer (Richard Martinez, another CitiMortgage employee), and the date the documents were notarized, CitiMortgage could have easily checked on its own whether there was any validity to Mr. Safar's complaint that Ms. Lindner and the signer could not have been in the same place when the documents were notarized. *Id.* at ¶ PC28. Because a copy of the December 6, 2010 letter from the ASO was sent to the AGO and to the "Notary File," had CitiMortgage contacted the ASO or the AGO after December 6, 2010, it is reasonable to infer it would have learned that Ms. Lindner's commission was revoked on December 6, 2010. *Id.* at ¶ PC29.

Once CitiMortgage was notified of Mr. Safar's complaint against Ms. Lindner, that should have raised a red flag and triggered action on CitiMortgage's part to affirmatively investigate the complaint and diligently monitor the status of the complaint and investigation with the ASO. *Id.* at ¶¶ PC33, PC35. Under reasonably prudent mortgage servicing practices and standards, CitiMortgage should also have discontinued allowing Ms. Lindner to notarize any documents on its behalf until a final decision was made by the ASO in connection with the pending complaint. *Id.* at ¶ PC34. Once CitiMortgage was informed that a complaint had been filed against one of its notaries, any monitoring

guidelines CitiMortgage had in place which applied to all of their notary employees – for example, checking the status of the notary's commission every thirty (30) days – needed to be escalated with respect to the notary in question, here Ms. Lindner. *Id.* at ¶ PC36. Checking the status of Ms. Lindner's notary commission (or that of any other CitiMortgage notary with a complaint filed against them) just weekly was reasonable once CitiMortgage knew a complaint had been filed against Ms. Lindner. *Id.* at ¶ PC37.

## III.    LEGAL ARGUMENT

### A.    Standard of Review.

"In resolving a summary judgment motion, the Court's function is not to determine the truth of the matter underlying the motion but to determine based on the submitted evidence, viewed in the non-moving party's favor, if there is a genuine issue for trial." *Brand v. U.S.*, 2017 WL 1736801, at *4 (D. Ariz. May 4, 2017) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-252 (1986)). "Questions involving a person's state of mind ... are generally factual issues inappropriate for resolution by summary judgment." *Friedman v. Live Nation Merch., Inc.*, 833 F.3d 1180, 1186 (9th Cir. 2016) (internal citation omitted); *see also Spencer v. Asher*, 2019 WL 125845, at *4 (Ariz. Ct. App. Jan. 8, 2019) ("[t]he knowledge requirement imposed by § 33-420 often involves factual disputes"); *Coventry Homes, Inc. v. Scottscom P'ship*, 155 Ariz. 215, 219 (Ariz. Ct. App. 1987) (reversing grant of summary judgment where genuine issue of material fact remained concerning whether party knew or should have known *lis pendens* was groundless; under § 33-420(A), "[w]hether a party has 'reason to know' must, of course, be determined from the circumstances on a case-by-case basis.").

Even where the material facts are undisputed, "summary judgment should not be granted where contradictory inferences may be drawn from such facts." *Braxton-Secret*, 769 F.2d at 531. "When a person's mental state is at issue, summary judgment is appropriate only when *'all* reasonable inferences that could be drawn from the evidence defeat the plaintiff's claim.'" *Miniace v. Pac. Mar. Ass'n*, 2006 WL 648732, at *4–5 (N.D.

Cal. Mar. 13, 2006) (quoting *Provenz v. Miller,* 102 F.3d 1478, 1489 (9th Cir. 1996) (emphasis original)). Because the reasonable inferences that can be drawn from the record support Plaintiff's claim, CitiMortgage's Motion should be denied.

**B.**   **There Is a Genuine Fact Issue Whether CitiMortgage "Knew or Had Reason to Know" the Recorded Documents Were Invalid at Recording.**

1.   <u>CitiMortgage is Charged with Knowing the Laws that Apply to it and Governing its Conduct Accordingly</u>.

CitiMortgage tries to downplay the complaint lodged against Ms. Lindner, arguing that anyone can bring a complaint against a notary "[t]hus there is no reason to believe a complaint will necessarily result in any adverse finding or action taken against the notary," and hence, no need for CitiMortgage to do anything whatsoever regarding the complaint. Doc. 103, p. 12. But CitiMortgage cannot hide its head in the sand and thereby avoid liability under § 33-420(A). This is because § 33-420(A) does not "shield a defendant from liability … when the party's ignorance of the invalidity of [the recorded document] arose from the party's own failure to take basic steps to assure its validity." *Delmastro & Eells v. Taco Bell Corp.*, 228 Ariz. 134, 144 (Ariz. Ct. App. 2011). Once CitiMortgage knew there was a chance Ms. Lindner's notary commission could be revoked – knowledge gained through its own policies and Ms. Linder's report of the complaint levied against her with the AGO – it could not just sit back and wait.

CitiMortgage is charged with knowing the laws that pertain to the documents it records. *Delmastro*, 228 Ariz. at 143. So, here, it was charged with knowing that the Assignment of Deed of Trust and Substitution of Trustee required acknowledgments, and that the acknowledgments could only be performed by a notary with a valid notary commission. A.R.S. §§ 33-401(B) ("Every deed or conveyance of real property must be signed by the grantor and must be duly acknowledged before some officer authorized to take acknowledgments."); 41-311(1) ("'Acknowledgment' means a notarial act in which a notary certifies that a signer, whose identity is proven by satisfactory evidence, appeared before the notary and acknowledged that the signer signed the document."); 41-311(6)

8

("'Notary public' or 'notary' means any person commissioned to perform notarial acts under this article."); 41-330 (The secretary of state … may revoke or suspend the commission of any notary public for … Failure to discharge fully and faithfully any of the duties or responsibilities required of a notary public."). CitiMortgage had policies in 2010 requiring its notaries to notify it of any complaints regarding notarial activities performed on behalf of CitiMortgage and any communications involving challenges to a notarized document or the status of the notary's commission. PCF ¶¶ PC21-22. It is reasonable to infer that these policies existed to help ensure compliance with A.R.S. §§ 33-401(B), 41-311(1) and (6), and 41-330.

Under A.R.S. § 33-420(A), "reason to know" means "the actor has information from which a person of reasonable intelligence ... would infer that the fact in question exists, or that such person would govern his conduct upon the assumption that such fact exists." *Coventry Homes*, 155 Ariz. at 219 (quoting Restatement (Second) of Torts § 12(1) (1965)). That is exactly what CitiMortgage had here, at a minimum.

As required under CitiMortgage's policies and procedures, on September 29, 2010, Ms. Lindner advised her manager that a complaint was lodged against her as a notary public with the AGO. PCF ¶ PC25; DSOF ¶ 15. Because Ms. Lindner notified her manager of the complaint, it is reasonable to infer that she also informed CitiMortgage about her October 11, 2010 letter to the AGO and her November 23, 2010 email exchange with Mr. Stanford, including copies of or the details of those communications. PCF ¶ PC26. *See Fridena v. Evans*, 127 Ariz. 516, 519 (1980) (there is a conclusive presumption under Arizona law that a corporation's agent or employee "will communicate to the corporation whatever knowledge or notice he receives in relation to his agency which is necessary for the protection of the interests of the corporation.").

So, by September 29, 2010, CitiMortgage knew more than enough to have directly checked whether there was any validity to the complaint, because both Ms. Linder (the notary) and Mr. Martinez (the signer) were CitiMortgage employees. PCF ¶¶ PC27-28. On

or about October 11, 2010, CitiMortgage knew Ms. Lindner had responded to the September 29, 2010 letter from the AGO and what documents and information she had provided. *Id.* at ¶ PC27. On or about November 23, 2010, CitiMortgage knew that the ASO would be issuing a decision on the complaint soon. *Id.* Any of these facts alone, much less all of them taken together, gave CitiMortgage more than enough "information from which a person of reasonable intelligence ... would infer that the fact in question exists, or that such person would govern his conduct upon the assumption that such fact exists." *Coventry Homes*, 155 Ariz. at 219 (quoting Restatement (Second) of Torts § 12(1) (1965)). Yet CitiMortgage did nothing.

How CitiMortgage should have then governed its conduct is what Plaintiff's expert, Mr. Wyatt, opines on. Once CitiMortgage was notified of the complaint and investigation against its notary employee, it should have affirmatively investigated the complaint and diligently monitored the status of the investigation to say informed and up to date on any determinations made by the ASO, including increasing how often it checked the status of Ms. Lindner's notary commission. PCF ¶¶ PC35-36. However often CitiMortgage checked the status of its notaries' commissions in the normal course of business, it was reasonable to increase the frequency to a weekly check for employees with complaints filed against them, including Ms. Lindner. *Id.* at ¶ PC36.

Under reasonably prudent practices and standards, CitiMortgage should also have discontinued allowing Ms. Lindner to notarize any documents on behalf of CitiMortgage until a final decision was made by the ASO in connection with the pending complaint, and should have monitored her work. *Id.* at ¶ PC34.[3] Ms. Murphy does not affirmatively rebut any of Mr. Wyatt's opinions, she instead opines that there were no laws, regulations, or "industry standards" that required CitiMortgage to act in the manner Mr. Wyatt opined was

---

[3] CitiMortgage stresses that even if it had checked with the ASO daily, there was no guarantee that it would have discovered that Ms. Lindner's notary commission was revoked on December 6, 2010. But the reason to know prong of § 33-420(A) merely requires enough information for a person of reasonable intelligence to proceed as if a given fact were true. *Coventry Homes*, 155 Ariz. at 219. It does not require a guarantee that CitiMortgage would have actually discovered the revocation.

prudent under reasonable industry practices and standards. *Id*. at ¶ PC42.

        2.    <u>Ms. Lindner's Knowledge is Also CitiMortgage's Knowledge Under the Doctrine of *Respondeat Superior*.</u>

    CitiMortgage as a company can only receive information through its employees, and, thus, actual knowledge to Ms. Lindner constitutes actual knowledge to CitiMortgage under the doctrine of *respondeat superior*. *Fridena*, 127 Ariz. at 519 ("A corporation is bound by the knowledge acquired by… its agents or officers which is within the scope of their authority and which is in reference to a matter to which their authority extends."); *see also State v. Far W. Water & Sewer Inc.*, 224 Ariz. 173, 195 (Ct. App. 2010), as amended (May 4, 2010) ("Because corporations can only act through their officers and agents, when corporate officers or agents act in their representative capacity and within the scope of their authority, such act is deemed to be an act of the corporation."); *Miller v. Arnal Corp.*, 129 Ariz. 484, 491 (1981) ( "a corporation is an impersonal entity which can only act through its officers and agents").

    This is not a case, then, like *Wyatt v. Wehmueller*, 167 Ariz. 281, 285 (1991), which addressed whether the common-law principle that an attorney has imputed authority to act on behalf of the client could be applied to hold the client liable under § 33-420(A) where the attorney acted without the client's knowledge or consent. *Id*. at 283-285. That is not the situation here, where Ms. Linder was acting within the course and scope of her employment as a notary for CitiMortgage. CitiMortgage's knowledge is based on *respondeat superior*, not agency principles, and under *respondeat superior* knowledge to Ms. Linder is knowledge to CitiMortgage. This is consistent with the *Wyatt* court's application of scienter principles under criminal law to liability under § 420(E), for under the common law, a corporation can be held criminally liable for the acts of its employees. *See, e.g.*, *U.S. v. A & P Trucking Co.*, 358 U.S. 121, 125 (1958) (it is "elementary that such impersonal entities" as corporations "can be guilty of 'knowing' or 'willful' violations of regulatory statutes through the doctrine of respondeat superior"); *Hanlester Network v. Shalala*, 51 F.3d 1390, 1400 (9th Cir. 1995) (affirming finding that defendants "knowingly and

willfully" violated statute where their employee knew her conduct violated the statute and intended for it to do so); *Apollo Fuel Oil v. U.S.*, 195 F.3d 74, 76–77 (2d Cir. 1999) (under doctrine of *respondeat superior* corporation "had reason to know" about presence of red-dyed fuel placed in propulsion tank where evidence showed defendant's employee or agent added the dye).[4]

Here, the relevant knowledge is whether the Recorded Documents were invalid at the time CitiMortgage recorded them on December 17, 2010. That Ms. Lindner performed the acknowledgments on the Recorded Documents after her notary commission was revoked makes them invalid.[5]

CitiMortgage also had copies of Ms. Lindner's notary logs, including the pages related to the Recorded Documents which it collected on a weekly basis, and so it is reasonable to infer that CitiMortgage knew what the logs contained, and thus whether Ms. Lindner's notary log for the Recorded Documents contained sufficient information to show compliance with A.R.S. §§ 33-401(B), 41-311(1) and (6), and 41-330. PCF ¶¶ PC4-5. Ms. Lindner's notary log entries for the Recorded Documents suffer from the same deficiencies as those which resulted in a determination that Ms. Lindner failed to clearly show that she identified the signer or that that signer was present with her for the notarization, and therefore "failed to properly perform the acknowledgment and executed a notarial certificate containing a false statement providing the Secretary grounds for suspension or

---

[4] *See also Boise Dodge, Inc. v. U.S.*, 406 F.2d 771, 772 (9th Cir. 1969) (noting "the established rule that a corporation, through the conduct of its agents and employees, may be convicted of a crime, including a crime involving knowledge and willfulness"); *City of New York v. FedEx Ground Package Sys., Inc.*, 351 F. Supp. 3d 456, 479 (S.D.N.Y. 2018) (employee's knowledge may be imputed to employer because "[c]orporate defendants can only act through their employees and agents.").

[5] Although not specifically at issue in this case, that is not the only possible reason they were invalid. For a proper acknowledgment, the signer must appear before the notary, prove their identity by satisfactory evidence, and acknowledge to the notary that they signed the document. § 41-311(1). Ms. Lindner, who was there, would know whether the person who signed the Assignment of Deed of Trust and acknowledged their signature actually did so in front of her. DSOF ¶ 11. If she wasn't, that would also make the Recorded Documents invalid, regardless of the status of Ms. Lindner's notary commission. A.R.S. §§ 33-401(B), 41-311(1) and (6), and 41-330.

revocation.." *Id.* at ¶ PC6. *Friedman*, 833 F.3d at 1189 (the knew or had reason to know prong of § 33-420(A) can be proven through inferences from circumstantial evidence).

### C.   Summary Judgment is Not Appropriate in a Battle of the Experts.

Here, in addition to the disputed material facts, which are of themselves enough to defeat CitiMortgage's Motion, the parties have each submitted expert testimony. "Expert opinion evidence is itself sufficient to create a genuine issue of disputed fact sufficient to defeat a summary judgment motion." *Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1270 (9th Cir. 1994); *see also Gingeleskie v. Westin Hotel Co.*, 145 F.3d 1337 (9th Cir. 1998) (reversing summary judgment for defendant where expert's testimony that hotel personnel did not conduct themselves in accordance with accepted standards of hotel management would allow a jury to conclude defendant had reason to know plaintiff was ill and failed to respond appropriately); *Bieghler v. Kleppe,* 633 F.2d 531, 534 (9th Cir. 1980) (affidavit of plaintiffs' accident reconstruction expert was sufficient to defeat defeendant's summary judgment motion.); *Montgomery v. Union Pac. R.R. Co.*, 2018 WL 6110930, at *6 (D. Ariz. Nov. 21, 2018) (it is not the court's function on summary judgment to "resolve an issue of fact based on conflicting expert testimony.") (quoting *Scharf v. U.S. Attorney Gen.*, 597 F.2d 1240, 1243 (9th Cir. 1979)). Here, the parties' experts have conflicting opinions regarding the actions CitiMortgage should or could have taken with respect to Ms. Lindner, and what CitiMortgage knew or should have known about Ms. Lindner's notary commission. This in and of itself is grounds to deny CitiMortgage's Motion.

### D.   CitiMortgage's *Daubert* Attack Fails.

CitiMortgage recognizes that the competing expert opinions in this case undermine the Motion, so it launches a baseless attack on Mr. Wyatt's opinions as "unsupported speculation" and "subjective beliefs." Doc. 103, pp. 13-17. As explained at his deposition, Mr. Wyatt's opinions are based on his 30 plus years of relevant experience in the banking and mortgage servicing industry. PCF ¶ PC41. That is more than sufficient under Rule 702. FED. R. EVID. 702 ("A witness who is qualified as an expert by knowledge, skill,

experience, training, or education may testify in the form of an opinion or otherwise if: … the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"). And, ironically, many of Mr. Wyatt's opinions are also supported by the testimony of CitiMortgage's expert, Ms. Murphy. PCF ¶¶ PC13-19, PC23-24, PC31, PC33-35, PC37.

Rule 702 is "intended to embrace more than a narrow definition of qualified expert." *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1015 (9th Cir. 2004) (quoting *Thomas*, 42 F.3d at 1269). An expert's experience alone can be enough to show that the expert's opinions are reliable. FED. R. EVID. 702(c) and Advisory Committee Note to 2000 amendments ("Nothing in this amendment is intended to suggest that experience alone— or experience in conjunction with other knowledge, skill, training or education—may not provide a sufficient foundation for expert testimony. To the contrary, the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience."). *See, e.g.*, *Hangarter*, 373 F.3d at 1016, 1018 (determining an expert was qualified based on "twenty-five years' experience working for insurance companies and as an independent consultant"); *see also Bazarian Int'l Fin. Assocs., LLC v. Desarrollos Aerohotelco, C.A.*, 315 F. Supp. 3d 101, 112–13 (D.D.C. 2018) (expert's "reliance on his extensive experience in the industry is sufficient to support the opinions proffered in his Report."); *Cedar Hill Hardware & Constr. Supply, Inc. v. Ins. Corp. of Hannover*, 563 F.3d 329, 343 (8th Cir. 2009) (testimony admissible under *Daubert* due to the expert's "exhaustive experience in the insurance industry"); *First Marblehead Corp. v. House*, 541 F.3d 36, 41 (1st Cir. 2008) (expert was qualified based on "nearly two decades of experience as a consultant in economics, finance, and strategy consulting"); *Century Indem. Co. v. The Marine Grp., LLC*, 2015 WL 5965614, at *4 (D. Or. Oct. 13, 2015) (expert opinions not speculative where based on relevant documents and expert's decades of experience in the relevant industry); *Millennium Labs., Inc. v. Darwin Select Ins. Co.*, 2014 WL 1921755, at *3 (S.D. Cal. May 14, 2014) (expert qualified under Rule 702 because his 30 years' experience in

the insurance industry "provided a sufficient foundation of reliability for his testimony").

*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025 (9th Cir. 2010) ("*Fortune*") is instructive. There, the plaintiff argued that a jury could construe the defendant's failure to investigate whether the phrase "DELICIOUS" was being used as a trademark as evidence of defendant's bad faith. *Id*. at 1043. In support, plaintiff offered it's expert's opinion that "[i]t is standard practice in the advertising and marketing industry ... to perform at least a cursory search on the Internet and with the United State[s] Trademark Office to see what else is out in the market ... to avoid possible conflicts or confusion." *Id*. The district court excluded the opinion and the Ninth Circuit reversed, explaining that the district court was "plainly wrong," where the expert's decades of experience in the marketing and advertising industry "strongly suggest[s] that he is familiar with what companies within the industry do when placing words on a product. [Plaintiff's expert]'s expertise, then, is one based on experience," and "will assist the trier of fact … to determine a fact in issue." *Id*. That is what Mr. Wyatt's opinions will do in this case – help the trier of fact determine what the reasonable and prudent industry practices, policies, and procedures were, and whether CitiMortgage's conduct complied with those standards, leading to the ultimate factual question of whether CitiMortgage had reason to know the Recorded Documents were invalid.

*Guidroz-Brault v. Missouri Pac. R. Co.*, 254 F.3d 825 (9th Cir. 2001), *Wright v. U.S.*, 2008 WL 820557 (D. Ariz. Mar. 25, 2008), and *U.S. v. Various Slot Machines on Guam*, 658 F.2d 697 (9th Cir. 1981) ("*Slot Machines*") are inapposite or distinguishable. In *Guidroz-Brault,* the Ninth Circuit held that the "district court abused its discretion by excluding [expert] testimony regarding [] operating procedure and standards of care," which was relevant and based on the expert's extensive experience in the industry. 254 F.3d at 830. The court instead excluded the expert's testimony as unreliable because it was based on an assumption of how far down the rails a lookout could see when the facts indicated that the track saboteurs had not left anything behind to see. *Id*. at 830-31.

In *Wright*, which involved a medical malpractice claim, a physician's opinions were excluded where the expert tried to create an issue of fact by submitting an affidavit which contradicted her prior testimony, failed to meet the requirements under A.R.S. § 12–2604(A) for expert testimony in a medical malpractice case, and failed to provide scientific support for her opinions. 2008 WL 820557, at **2, 6-7.

In *Slot Machines*, the court referred to the experts' affidavits as "2 1/2 pages of quibble" and "5 1/2 legal-size pages of pettifoggery," and held that the affidavits failed to satisfy Rule 56(c) where the experts stated that the machines at issue were "Electronic Point-Maker Machines," not gambling machines, but neither explained the difference nor provided any facts to support their opinions. 658 F.2d at 699-700. As discussed above, Mr. Wyatt's opinions are supported by the facts in the case, including CitiMortgage's own policies and procedures, as well as by his deposition testimony, and decades of experience in the mortgage servicing industry. They are also supported by CitiMortgage's expert, Lisa Murphy. PCF ¶¶ PC13-19, PC23-24, PC31, PC33-35, PC37.

### E.    CitiMortgage's Other Cited Authorities Are Inapt.

CitiMortgage misdescribes *Bergdale v. Quality Loan Serv. Corp.*, 2017 WL 373014, at *3 (D. Ariz. Jan. 26, 2017) as "granting summary judgment for defendant … under A.R.S. § 33-420(A) where plaintiff could not show that defendant knew or had reason to know that recorded document was invalid." Doc. 103, p. 9. In *Bergdale*, plaintiff alleged that the defendant knew or should have known the property interest asserted in the recorded notice was groundless, and the plaintiff's claim failed because she relied on an equivocal letter she herself had sent to the defendant, which gave the defendant an arguable interest in the property and thus a basis to act as it did. 2017 WL 373014, at *3. The court emphasized that the plaintiff did not allege that the recorded document was invalid due to the failure to comply with procedural prerequisites, which Plaintiff does do here. *Id.*

CitiMortgage's citation to *F.T.C. v. Network Servs. Depot, Inc.*, 617 F.3d 1127 (9th Cir. 2010) ("*Network Servs.*") is just as hard to fathom. There, the district court applied a

completely different statutory "knowledge" standard under the FTC Act: knowledge by showing that the defendant "had actual knowledge of material misrepresentations, [was] recklessly indifferent to the truth or falsity of a misrepresentation, or had an awareness of a high probability of fraud along with an intentional avoidance of the truth." *Id*. at 1138-39 (internal citation omitted). The FTC Act standard thus lacks the objective, "had reason to know" component at the core of § 33-420(A). Furthermore, the Ninth Circuit acknowledged that "[q]uestions involving a person's state of mind, e.g., whether a party knew or should have known of a particular condition, are generally factual issues inappropriate for resolution by summary judgment." *Id*. at 1139 (quoting *Braxton–Secret* 769 F.2d at 531). The Ninth Circuit nevertheless concurred with the district court's conclusion that the FTC's evidentiary showing admitted of no inference other than that the defendant acted knowingly when applying the FTC Act standard. *Id*.

Obviously, nothing in *Network Servs*. supports the ***opposite*** inference that CitiMortgage wishes to draw here, *i.e.*, that as a matter of law it ***lacked*** knowledge of the Recorded Document's invalidity, let alone within the meaning § 33-420(A)'s different knowledge standard. Moreover, as discussed above, the inferences that can be drawn from the material facts in this case support Plaintiff's claim, and thus are "contradictory inferences" to those CitiMortgage tries to draw, making summary judgment inappropriate. *Braxton–Secret,* 769 F.2d at 531 ("summary judgment should not be granted where contradictory inferences may be drawn from such facts").

**IV.   Conclusion**

For each and all of the foregoing reasons, CitiMortgage's Motion is not well-taken and should be denied in its entirety.

////
////
////
////

17

DATED this 8th day of May 2019.

**BONNETT, FAIRBOURN, FRIEDMAN
& BALINT, P.C.**

By: s/Andrew S. Friedman
    Andrew S. Friedman, Esq. (005425)
    Nada Djordjevic (*admitted pro hac vice*)
    2325 East Camelback Road, Suite 300
    Phoenix, Arizona 85016
    afriedman@bffb.com
    ndjordjevic@bffb.com
    Telephone: (602) 274-1100

Patricia N. Syverson, Esq. (AZ 020191)
600 W. Broadway, Suite 900
**BONNETT FAIRBOURN FRIEDMAN
& BALINT, P.C.**
San Diego, CA 92101
psyverson@bffb.com
Telephone: (619) 798-4593

David N. Lake (*admitted pro hac vice*)
**LAW OFFICES OF DAVID N. LAKE,
A Professional Corporation**
16130 Ventura Boulevard, Suite 650
Encino, California 91436
david@lakelawpc.com
Telephone: (818) 788-5100

*Attorneys for Plaintiff*

18

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I, Trish Aquilino, hereby certify that a true copy of the foregoing document filed through the ECF system will be electronically sent to the registered participants as identified on the Notice of Electronic Filing, and paper copies will be sent to those indicated as non-registered participants on May 8, 2019.

*/s/ Trish Aquilino*