1

Andrew S. Friedman, Esq. (005425)
**BONNETT FAIRBOURN FRIEDMAN
  & BALINT, P.C.**
2325 East Camelback Road, Suite 300
Phoenix, Arizona 85016
afriedman@bffb.com
Telephone: (602) 274-1100

2

3

4

5

Patricia N. Syverson, Esq.  (020191)
**BONNETT FAIRBOURN FRIEDMAN
  & BALINT, P.C.**
600 W. Broadway, Suite 900
San Diego, CA 92101
psyverson@bffb.com
Telephone: (602) 274-1100

6

7

8

9

David N. Lake (*admitted pro hac vice*)
**LAW OFFICES OF DAVID N. LAKE,
  A Professional Corporation**
16130 Ventura Boulevard, Suite 650
Encino, California 91436
david@lakelawpc.com
Telephone: (818) 788-5100

10

11

12

13

*Attorneys for Plaintiff*

14

## IN THE UNITED STATES DISTRICT COURT

15

## FOR THE DISTRICT OF ARIZONA

16

17

18

19

20

21

22

23

24

25

26

27

28

| David A. Kester, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CitiMortgage, INC.; CR Title Services, Inc.; and Does 1 to 25, inclusive<br><br>Defendants. | Case No.  CV-15-00365-PHX- DLR<br><br>**PLAINTIFF'S COUNTERSTATEMENT OF MATERIAL FACTS IN RESPONSE TO DEFENDANTS' STATEMENT OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>**(Oral Argument Requested)**<br><br>Assigned to Judge: Hon. Douglas L. Rayes |
| --- | --- |

Pursuant to Federal Rule of Civil Procedure 56(c) and Local Rule of Civil Procedure 56.1(b) of the United States District Court for the District of Arizona, Plaintiff David A. Kester ("Plaintiff") hereby submits the following Counterstatement of Facts ("Counterstatement") in response to Defendants' Statement of Facts (Doc. 104). Plaintiff's Counterstatement is submitted in opposition to Defendants' Motion for Summary Judgment (Doc. 103). Where Plaintiff does not dispute a given fact or exhibit below, he is doing so only for the purposes of summary judgment. Plaintiff reserves the right to dispute any such fact or exhibit at trial or if used for any other purpose. Plaintiff further submits the Affidavit of Andrew S. Friedman and the attached exhibits in support of the propositions in Plaintiff's Counterstatement.

## I.    PLAINTIFF'S RESPONSES TO DEFENDANTS' STATEMENT OF FACTS

1.    Plaintiff admits Defendants' Statement of Fact ("SOF") No. 1.

2.    Plaintiff admits SOF No. 2.

3.    Plaintiff admits SOF No. 3.

4.    Plaintiff admits SOF No. 4.

5.    Plaintiff disputes SOF No. 5, which is not supported by the cited materials (Doc. 104-1, Ex. C). The August 10, 2007 letter attached as Exhibit C to Defendants' Statement of Facts notified Plaintiff that mortgage loan servicing for his mortgage was being "transferred" from ABN AMRO Mortgage Group, Inc. to CitiMortgage, Inc. effective September 1, 2007. *Id*. ABN AMRO Mortgage Group, Inc. is identified as Plaintiff's "present servicer," and CitiMortgage, Inc. is identified as Plaintiff's "future servicer." *Id*. Exhibit C also informed Plaintiff "[t]he transfer does not affect the terms or conditions of your loan documents other than the terms directly related to the servicing of your loan." *Id*. Exhibit C says nothing about ABN AMRO Mortgage Group, Inc. merging into CitiMortgage, Inc. Exhibit C says nothing about CitiMortgage, Inc. succeeding to any rights ABN AMRO may have with respect to Plaintiff's Note or the Deed of Trust. The Note (Doc. 104-1, Ex. A) does not mention loan servicers, and the Deed of Trust (Doc.

1

104-1, Ex. B) defines a loan servicer as: "the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other loan servicing obligations under the Note, this Security Instrument and Applicable Law." Neither the Note nor the Deed of Trust grant any rights to the Loan Servicer. *Id*.

6. Plaintiff disputes SOF No. 6. Further responding, SOF No. 6 should be stricken as the status of any payments made by Plaintiff on the Note are irrelevant to the claims, defenses, or issues in this case and to Defendants' Motion for Summary Judgment. SOF No. 6 should also be stricken as calling for a legal conclusion regarding what constitutes going "into default."

7. Plaintiff admits that the materials cited in support of SOF No. 7 (Doc. 104-1, Ex. E and Ex. F) appear to be accurate copies of an Assignment of Deed of Trust and a Substitution of Trustee recorded with the Maricopa County Recorder. Plaintiff otherwise disputes SOF No. 7. Defendants have not established, and Plaintiff is unable to determine, whether the Assignment of Deed of Trust and Substitution of Trustee were actually signed by Lisa Markham, whether she was an Assistant Vice President for Defendant CitiMortgage (at all or at the time of her alleged signature), the date on which the documents were signed, or whether they were actually signed in Ms. Lindner's presence. Ms. Lindner's notary log entries for the Assignment of Deed of Trust and Substitution of Trustee suffer from the same deficiencies as those identified in the December 6, 2010 letter from the Arizona Secretary of State's Office ("ASO") – which resulted in a determination that Ms. Lindner failed to clearly show that she identified the signer or that that signer was present with her for the notarization, and therefore "failed to properly perform the acknowledgment and executed a notarial certificate containing a false statement providing the Secretary grounds for suspension or revocation. A.R.S. §§ 41-319 and 41-330(A)(10)." Declaration of Andrew S. Friedman In Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment ("Friedman Dec."), **Exhibit 1**, Notary Log Excerpt (CR000193-196); Doc. 104-1, Ex. O.

2

8.     Plaintiff admits that the material cited in support of SOF No. 8 (Doc. 104-1, Ex. E) appears to be an accurate copy of an Assignment of Deed of Trust recorded with the Maricopa County Recorder.  Plaintiff denies that the Assignment of Deed of Trust was a valid document or had any legal effect.  The Assignment of Deed of Trust had to be "duly acknowledged before some officer authorized to take acknowledgments," A.R.S. § 33-401(B), and was invalid without a proper acknowledgment.  *Kester v. CitiMortgage Inc.*, 709 F. App'x 869, 873–74 (9th Cir. 2017).  Ms. Lindner's notary commission was revoked by the ASO on December 6, 2010.  Doc. 104-1, Ex. O; Friedman Dec., **Exhibit 2**, June 9, 2011 letter from the ASO to Kristen B. Lindner (KESTER-000055-57).    Thus, the acknowledgement on the Assignment of Deed of Trust was invalid.  *Kester*, 709 F. App'x at 873–74.  The following portion of SOF No. 8 should also be stricken as irrelevant to the issues in this case and to Defendants' Motion for Summary Judgment and because it calls for a legal conclusion: "which provided notice of the assignment of AAMG's interest in the Deed of Trust to CitiMortgage."  Plaintiff otherwise disputes SOF No. 8.    The Assignment of Deed of Trust and Substitution of Trustee do not indicate the order in which they were signed.  Defendants have not established, and Plaintiff is unable to determine, whether the Assignment of Deed of Trust was actually signed by Lisa Markham, whether she was an Assistant Vice President for Defendant CitiMortgage (at all or at the time of her alleged signature), the date on which the document was signed, or whether it was actually signed in Ms. Lindner's presence.    Ms. Lindner's notary log entry for the Assignment of Deed of Trust also suffers from the same deficiencies as those identified in the December 6, 2010 letter from the ASO – which resulted in a determination that Ms. Lindner failed to clearly show that she identified the signer or that that signer was present with her for the notarization, and therefore "failed to properly perform the acknowledgment and executed a notarial certificate containing a false statement providing the Secretary grounds for suspension or revocation." Friedman Dec., Ex. 1; Doc. 104-1, Ex. O.

3

9.      Plaintiff admits that the material cited in support of SOF No. 9 (Doc. 104-1, Ex. F) appears to be an accurate copy of a Substitution of Trustee recorded with the Maricopa County Recorder.  Plaintiff denies that the Substitution of Trustee was a valid document or had any legal effect.   The Substitution of Trustee had to be "duly acknowledged before some officer authorized to take acknowledgments," A.R.S. § 33-401(B), and was invalid without a proper acknowledgment. *Kester*, 709 F. App'x at 873–74.  Ms. Lindner's notary commission was revoked by the ASO on December 6, 2010. Doc. 104-1, Ex. O; Friedman Dec., Ex. 2. Thus, the acknowledgement on the Assignment of Deed of Trust was invalid. *Kester*, 709 F. App'x at 873–74.  The following portion of SOF No. 9 should be stricken as irrelevant to the issues in this case and to Defendants' Motion for Summary Judgment and because it calls for a legal conclusion: "which substituted CR Title in place of First American as the Trustee under the Deed of Trust." Plaintiff otherwise disputes SOF No. 9.  The Substitution of Trustee and Assignment of Deed of Trust do not indicate the order in which they were signed.  Defendants have not established, and Plaintiff is unable to determine, whether the Substitution of Trustee was actually signed by Lisa Markham, whether she was an Assistant Vice President for Defendant CitiMortgage (at all or at the time of her alleged signature), the date on which the document was signed, or whether it was actually signed in Ms. Lindner's presence.  Ms. Lindner's notary log entries for the Substitution of Trustee suffer from the same deficiencies as those identified in the December 6, 2010 letter from the ASO – which resulted in a determination that Ms. Lindner failed to clearly show that she identified the signer or that that signer was present with her for the notarization, and therefore "failed to properly perform the acknowledgment and executed a notarial certificate containing a false statement providing the Secretary grounds for suspension or revocation." Friedman Dec., Ex. 1; Doc. 104-1, Ex. O.

10.      Plaintiff admits that the material cited in support of SOF No. 10 (Doc. 104-1, Ex. G) appears to be an accurate copy of a Notice of Trustee's Sale recorded with the

Maricopa County Recorder.  Plaintiff otherwise disputes SOF No. 10.  Defendants have not established, and Plaintiff is unable to determine, whether the Notice of Trustee's Sale was actually signed by Louise Villasenor, whether she was a Trustee Specialist for Defendant CR Title Services (at all or at the time of her alleged signature), the date on which the document was signed, or whether it was actually signed in Ms. Lindner's presence.  Ms. Lindner's notary log entry for the Notice of Trustee's Sale suffers from the same deficiencies as those identified in the December 6, 2010 letter from the ASO – which resulted in a determination that Ms. Lindner failed to clearly show that she identified the signer or that that signer was present with her for the notarization, and therefore "failed to properly perform the acknowledgment and executed a notarial certificate containing a false statement providing the Secretary grounds for suspension or revocation." Friedman Dec., Ex. 1; Doc. 104-1, Ex. O.

11.    In response to SOF No. 11, Plaintiff admits that the Assignment of Deed of Trust, Substitution of Trustee, and Notice of Trustee's Sale were notarized by Ms. Lindner on December 16, 2010.  Further responding, Plaintiff denies that the Assignment of Deed of Trust, Substitution of Trustee, and Notice of Trustee's Sale were valid documents and denies that they had any legal effect.  The Assignment of Deed of Trust and the Substitution of Trustee had to be "duly acknowledged before some officer authorized to take acknowledgments," A.R.S.  § 33-401(B), and was invalid without a proper acknowledgment. *Kester*, 709 F. App'x at 873–74.  Ms. Lindner's notary commission was revoked by the ASO on December 6, 2010.  Doc. 104-1, Ex. O; Friedman Dec., Ex. 2. Thus, the acknowledgements on the Assignment of Deed of Trust and on the Substitution of Trustee were invalid. *Kester*, 709 F. App'x at 873–74.

12.    Plaintiff admits SOF No. 12.

13.    Plaintiff admits SOF No. 13.

14.    Plaintiff admits SOF No. 14.  Further responding, Exhibit I is not a complete copy of the documents sent to Ms. Lindner on September 29, 2010.  The letter indicates

5

1   that a "8/17/10 complaint form and Description of Crimes report" were enclosed with the

2   letter.  Doc 104-1, Ex. I (CITI-KESTER-000917).  The complaint for and Description of

3   Crimes report is Exhibit H to Defendants' Statement of Facts.  Exhibit I to Defendants'

4   Statement of Facts should include both the letter and complaint, as provided to Ms.

5   Lindner. *Id*.

6           15.     Plaintiff admits SOF No. 15.

7           16.     In response to SOF No. 16, Plaintiff admits that Ms. Lindner sent a letter

8   dated October 11, 2010 to the Arizona Attorney General's Office ("AGO") enclosing a

9   copy of her notary log for April 2, 2010.  Plaintiff denies that Ms. Lindner substantively

10  responded to the complaint itself.  Doc. 104-1, Ex. O ("As part of the investigation, the

11  AGO forwarded to the Notary the complaint form and repot filed by the complainant which

12  describes the allegations in detail. In this instance, in her response letter the Notary failed

13  to directly address the allegations regarding the signer not being in the State of Arizona in

14  order to sign the documents in the Notary's presence. Therefore, the Notary has failed to

15  comply with any investigations that are initiated by the secretary of state or the attorney

16  general and provides grounds suspension or revocation. A.R.S. §§ 41-313(B)(4), 41-

17  330(A)(4) and 41-331(B).").

18          17.     Plaintiff admits SOF No. 17.

19          18.     Plaintiff admits SOF No. 18.

20          19.     Plaintiff admits SOF No. 19.

21          20.     Plaintiff admits SOF No. 20.  Further responding, the December 6, 2010

22  letter informed Ms. Lindner that the ASO "has determined to revoke" Ms. Lindner's notary

23  commission "effective immediately," and that she was required to deliver her notary seal,

24  notarial journal, and notarial records to the ASO. Doc. 104-1, Ex. O.  A copy of the

25  December 6, 2010 letter was sent to the AGO and to the "Notary File." *Id*.  Plaintiff denies

26  any suggestion by Defendants that providing Ms. Lindner with an opportunity to file a

27  notice of appeal had any effect on the effective date of the revocation of her notary

28

                                          6

commission, which was "effective immediately" on December 6, 2010. Doc. 104-1, Ex. O; Friedman Dec., Ex. 2.

21.     Plaintiff admits SOF No. 21.

22.     Plaintiff admits SOF No. 22.

23.     Plaintiff admits SOF No. 23.

24.     Plaintiff disputes SOF No. 24.  The Declaration of Records Custodian cited in support of SOF No. 24 indicates that CITI-KESTER-0000970 is a true and correct copy of database records regarding a complaint about Ms. Lindner and that those records "reflect" that the December 6, 2010 letter of revocation "was returned to the Arizona Secretary of State's office through the United States mails and was marked "UNCLAIMED – UNABLE TO FORWARD."  Doc. 104-1, Ex. Q. Neither the Declaration of Records Custodian nor the database records themselves say that the letter was sent to the wrong address or otherwise undeliverable.  *Id.*  Ms. Linder previously accepted delivery of two other letter sent to her via certified mail by the AGO at her home address – the same address the December 6, 2010 letter was mailed to.  Doc. 104-1, Exs. I, L, and O.  The ASO also confirmed that the address on the December 6, 2010 letter to Ms. Lindner was correct. Doc. 104-1, Ex. P (CITI-KESTER-000970) ("verified mailing/physical address, it is correct; sent final attempt ltr to the bus address (receipt 7008 2810 0000 2866 7760); cc'd AGO …").  The Declaration of Records Custodian does not state that it is based on personal knowledge or that it is based on the Records Custodian's own review of the records discussed in the Declaration. *Id*.  The Declaration of Records Custodian does not "confirm" that that the actions reflected in the database records actually occurred. *Id*.  It only certifies the records themselves.  *Id*.

25.     Plaintiff admits SOF No. 25.

26.     Plaintiff disputes SOF No. 26.  Plaintiff admits that the January 14, 2011 letter from the ASO states "the Secretary of State has determined to revoke" Ms. Lindner's notary commission and that Ms. Lindner could request an evidentiary hearing by filing a

written notice of appeal within thirty (30) days.  Doc. 104-1, Ex. R.  Plaintiff denies any suggestion by Defendants that providing Ms. Lindner with an opportunity to file a notice of appeal had any effect on the effective date of the revocation of her notary commission, which was December 6, 2010. Doc. 104-1, Ex. O; Friedman Dec., Ex. 2.   Further responding, the portion of SOF No. 26 referring to the December 6, 2010 letter should be stricken as not supported by the material cited.  The January 14, 2011 letter was clearly identified as a "2nd and Final Attempt" to notify Ms. Lindner of the results of the investigation of Mr. Safar's complaint against Ms. Lindner, but says nothing about why a second letter was sent.  Doc. 104-1, Ex. R.

27.    Plaintiff disputes SOF No. 27.  Plaintiff admits that the January 14, 2011 letter contains the phrase "effective immediately".  However, it is clear from the January 14, 2011 letter that the actual revocation date for Ms. Lindner's notary commission is earlier than January 14, 2011 given the inclusion of "2nd and final attempt" in the subject line.  Doc. 104-1, Ex. R.  Further responding, the portion of SOF No. 27 referring to the December 6, 2010 letter should be stricken as not supported by the material cited.  The January 14, 2011 letter was clearly identified as a "2nd and Final Attempt" to notify Ms. Lindner of the results of the investigation of Mr. Safar's complaint against Ms. Lindner, but says nothing about why a second letter was sent.  *Id*.  Plaintiff disputes any suggestion by Defendants that the effective date of the revocation of Ms. Lindner's notary commission was any date other than December 6, 2010. Doc. 104-1, Ex. O; Friedman Dec., Ex. 2.

28.    Plaintiff admits SOF No. 28.

29.    Plaintiff disputes SOF No. 29 as not supported by the materials cited, which admit only "that Responding Party is alleging the documents recorded with the County Recorder were invalid," and otherwise objects to Request for Admission Nos. 8-11 as irrelevant, vague and ambiguous, and as calling for a legal conclusion. Doc. 104-1, Ex. S. Further responding, Plaintiff admits that the Assignment of Deed of Trust, Substitution of

Trustee, and Notice of Trustee's Sale were invalid.  Plaintiff otherwise objects to SOF No. 29 as calling for a legal conclusion and asks that it be stricken.

30.     Plaintiff admits SOF No. 30.

31.     Plaintiff admits SOF No. 31.

32.     Plaintiff admits SOF No. 32.

33.     In response to SOF No. 33, Plaintiff admits that Mr. Wyatt is not offering an expert opinion regarding whether Defendants had "actual" knowledge on December 16, 2010 or December 17, 2010 that Ms. Lindner's notary commission had been revoked, nor is "actual" knowledge a proper statement of what the applicable statute requires.

34.     Plaintiff admits SOF No. 34.

35.     Plaintiff disputes SOF No. 35 as incomplete.  Mr. Wyatt opined that "[u]nder reasonably prudent industry standards, CitiMortgage should have discontinued allowing Kristen Lindner to notarize any documents until a final decision was made in connection with the pending complaint, and should have monitored the status of the investigation into Ms. Lindner's Notary commission through the Arizona Secretary of State Office." Doc. 104-1, Ex. T.  Further responding, Defendants' expert, Ms. Murphy, admits that it would have been reasonable for CitiMortgage to "take the conservative approach" and monitor Ms. Lindner's work once they learned in September 2010 about the complaint made against her in August 2010.  Friedman Dec., **Exhibit 3**, Transcript of the March 21, 2019 Deposition of Lisa B. Murphy ("Murphy Trans."), at 229:24-230:20.

36.     Plaintiff disputes SOF No. 36. SOF No. 36 is also not supported by the material cited (Doc. 104-1, Ex. V, at 58:15-63:15). Mr. Wyatt stated that he was unaware of whether Arizona law allowed a notary to continue notarizing documents during an ongoing investigation.  Friedman Dec., **Exhibit 4**, Transcript of the March 18, 2019 Deposition of Christopher J. Wyatt ("Wyatt Trans."), at 58:15-60:1, 63:12-15. But he went on to explain that CitiMortgage itself had policies in effect in 2010 requiring Ms. Lindner to notify her manager of the complaint filed against her in connection with her notary

9

commission, and in light of the information in an Inspector General report regarding CitiMortgage, that he believed they had policies in place generally with respect to notaries reporting information regarding their commissions to CitiMortgage. *Id*. at 60:2-61:15; 62:2-21. And when an entity in the mortgage servicing industry gets notice that a complaint has been filed against one of its notaries, such as CitiMortgage did here, that raises serious issues and signals a need on the part of the servicer to affirmatively investigate what is going on. *Id*. at 60:17-61:15. He also confirmed the opinion from his expert report that "[u]nder reasonably prudent industry standards, CitiMortgage should have discontinued allowing Kristen Lindner to notarize any documents until a final decision was made in connection with the pending complaint and should have monitored the status of the investigation into Ms. Lindner's notary commission through the Arizona secretary of state office." *Id*. at 62:25-63:8.  Complaints against a notary employee should be taken seriously by mortgage servicers because the notary is notarizing documents on behalf of the servicer. *Id*. at 63:16-64:21. Based on Mr. Wyatt's decades of experience in the industry, once a mortgage servicer knows that a complaint has been filed against one of its notaries, it is reasonable and prudent for the servicer to independently investigate the nature of the complaint and diligently monitor the status of the complaint to monitor its progress and learn about any determinations made by the ASO with respect to the complaint. *Id*.  The most reasonable additional approach for CitiMortgage to take would be to not allow the notary employee to notarize any documents for CitiMortgage until a final determination is made with respect to the complaint against the notary. *Id*. at 64:25-66:1.

37.     Plaintiff disputes SOF No. 37.  SOF No. 37 is also not supported by the materials cited (Doc. 104-1, Ex. V, at 51:20-56:16; 70:23-72:22; 81:13-16).   The cited pages involve discussions of policies generally that Mr. Wyatt was aware of regarding monitoring notaries (51:20-56:16); Mr. Wyatt's opinion that "the mortgage servicing industry is guided and controlled by policies and procedures that establish requirements for the servicing of both performing and nonperforming loans, including parameters and

controls to ensure compliance with the execution and notarization of applicable documents" and what some of those were (70:23-72:22); and monthly validation of the commission status of all notaries employed by the servicer (81:13-16).

38.     Plaintiff disputes SOF No. 38, which is not supported by the materials cited (Doc. 104-1, Ex. U, at ¶ 14).  In paragraph 14 of her Rebuttal Report, Ms. Murphy opines that there was no requirement or standard in late 2010 that servicers suspend a notary who was the subject of a complaint or under investigation by state officials.  *Id*.  Neither Plaintiff nor his expert Mr. Wyatt have argued that CitiMortgage should have suspended Ms. Linder (although this, or at least reassigning her to other duties, would have been prudent under the circumstances), only that they should have directed her not to notarize documents on behalf of CitiMortgage until a final determination was made on the complaint filed against her.  Doc. 104-1, Ex. T, pp. 3, 5.  Further responding, when Ms. Murphy uses the term "requirement" she is referring solely to regulatory requirements and regulatory guidance. Friedman Dec., Ex. 3, Murphy Trans., at 222:1-223:4.  When Ms. Murphy uses the terms "industry standard" or "standard," she is referring solely to published, written requirements dictated by regulatory guidance or defined by someone who is responsible for the industry, primarily regulators as a standard the mortgage servicing industry is required to follow. Friedman Dec., Ex. 3, Murphy Trans., at 80:6-81:13, 90:2-92:24, 94:6-15, 223:5-226:14. Whether CitiMortgage knew or had reason to know that Ms. Lindner's notary commission was revoked is not limited to whether specific laws, regulations, or regulatory guidance required them to take certain steps, but reaches more broadly to the policies and procedures CitiMortgage actually had in place, and to what reasonable and prudent practices CitiMortgage should have followed given the information it unquestionably had. Friedman Dec., Ex. 4, Wyatt Trans., at 60:17-61:15; 63:16-64:21.

39.     Plaintiff objects to the use of the word "suggests" in the first sentence of SOF No. 39.  Mr. Wyatt, based on his decades of experience in the banking and mortgage servicing industry is opining, not "suggesting," that "[r]egardless of whether the December

11

6, 2010 letter was actually received and read by Defendants, in my opinion, upon notification of any complaint regarding a notary, reasonably prudent mortgage practices would have required Defendants to independently monitor the investigation of the notary's commission and the results thereof.  This is especially true where, as here, CitiMortgage was aware of the complaint lodged with the ASO in September 2010 against Kristen Lindner." Doc. 104-1, Ex. T, p. 6. Plaintiff denies the second sentence of SOF No. 39 as incomplete and further objects to the use of the word "suggests."  Rather, Mr. Wyatt opined that it is his understanding had CitiMortgage contacted the ASO in any manner after the December 6, 2010 letter was issued, they would have informed CitiMortgage that Ms. Lindner's commission had been revoked. *Id*.  "Because CitiMortgage knew or should have known that Kristen Lindner's notary commission was subject to revocation given that they admit they were advised and aware of the pending complaint, CitiMortgage had an obligation to affirmatively monitor the pending investigation and to independently determine what the status of Ms. Lindner's notary commission was." *Id*. at pp. 6-7.

40.    In response to SOF No. 40, Plaintiff admits that the only written policies Defendants have produced in this case require validation of the status of the commissions of all their notary employees once a month.  Plaintiff otherwise disputes SOF No. 40. CitiMortgage admits it had policies and procedures in place in 2010 requiring that they be notified of any complaint lodged against a notary performing notarial services for CitiMortgage.  Friedman Dec., **Exhibit 5**, Amended Response to Request for Admission Nos. 15 and 16.  Mr. Wyatt opined that whatever procedures are in place with respect to all notary employees, those needed to be escalated once CitiMortgage was informed that a complaint had been filed against one of their notaries, Ms. Lindner; and that it was his understanding that if CitiMortgage had contacted the ASO at any point after the December 6, 2010 letter was issued, they would have been informed that Ms. Lindner's notary commission had been revoked.  Doc. 104-1, Ex. T, p. 6; Friedman Dec., Ex. 4, Wyatt Trans., at 81:17-82:8.

41.     Plaintiff disputes SOF No. 41.  Mr. Wyatt testified that the written policies regarding monitoring notaries that he was aware of required monitoring the status of all notaries every thirty days.  Friedman Dec., Ex. 4, Wyatt Trans., at 53:9-54:5.  He also testified, however, that reasonable standards would dictate that mortgage servicers "independently monitor the investigation and the results of any adverse action in connection with the notary's commission upon notification of any complaint regarding the notary," and that whatever procedures are in place with respect to all notary employees, those need to be escalated once a mortgage servicer is informed that a complaint has been filed against one of their notaries.  *Id*. at 54:12-22, 81:17-82:8.  It was also an expectation in the mortgage servicing industry long before 2010 that if a complaint was filed against a notary or there was an investigation with respect to a notary, that that would be brought to the attention of the notary's manager for follow up; that it would be reasonable for the servicer to do their own investigation; and that mortgage servicers would want to know the results of any such complaints or investigations because it could affect the notary's ability to do their job.  Friedman Dec., Ex. 3, Murphy Trans., at 122:23-123:7, 124:19-125:18, 128:9-129:7, 138:12-139:10.

42.     Plaintiff disputes SOF No. 42.  Mr. Wyatt testified that the written policies regarding monitoring notaries that he was aware of required monitoring the status of all notaries every thirty days.  Friedman Dec., Ex. 4, Wyatt Trans., at 53:9-54:5.  He also testified, however, that reasonable standards would dictate that mortgage servicers "independently monitor the investigation and the results of any adverse action in connection with the notary's commission upon notification of any complaint regarding the notary," and that whatever procedures are in place with respect to all notary employees, those need to be escalated once a mortgage servicer is informed that a complaint has been filed against one of their notaries.  *Id*. at 54:12-22, 81:17-82:8.  It was also an expectation in the mortgage servicing industry long before 2010 that if a complaint was filed against a notary or there was an investigation with respect to a notary, that that would be brought to

13

the attention of the notary's manager for follow up; that it would be reasonable for the servicer to do their own investigation; and that mortgage servicers would want to know the results of any such complaints or investigations because it could affect the notary's ability to do their job.  Friedman Dec., Ex. 3, Murphy Trans. at 122:23-123:7, 124:5-12, 124:19-125:18, 128:9-129:7, 138:12-139:10.

43.    In response to SOF No. 43, Plaintiff admits that in paragraph 14 of her Rebuttal Report, Ms. Murphy states "[t]here was no requirement or standard in late 2010 that servicers validate a notary's commission status at a frequency asserted by Mr. Wyatt, or at any specified frequency."  Doc. 104-1, Ex. U, at ¶ 14.  Further responding, when Ms. Murphy uses the term "requirement" she is referring solely to regulatory requirements and regulatory guidance.  Friedman Dec., Ex. 3, Murphy Trans., at 222:1-223:4.  When Ms. Murphy uses the terms "industry standard" or "standard," she is referring solely to published, written requirements dictated by regulatory guidance or defined by someone who is responsible for the industry, primarily regulators as a standard the mortgage servicing industry is required to follow. *Id*. at 80:6-81:13, 90:2-92:24, 94:6-15, 223:5-226:14.

44.    Plaintiff admits SOF No. 44.  Further responding, however, a copy of the December 6, 2010 letter from the ASO was sent to the "Notary File" and there is nothing in the record indicating that this was not done immediately after the letter was issued.  Doc. 104-1, Ex. O.

45.    Plaintiff admits SOF No. 45.

46.    Plaintiff admits SOF No. 46.

47.    Plaintiff admits SOF No. 47.

48.    In response to SOF No. 48, Plaintiff admits that Mr. Wyatt testified that he did not independently verify Mr. Waxman's declaration.  Plaintiff denies that Mr. Wyatt was required to do so.  Plaintiff further admits that Mr. Wyatt testified that he does not know whether Ms. Ogaz worked for the ASO in December 2010.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## II.     PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS

**PC1.**  Plaintiff incorporates his Responses to Defendants' Statement of Facts In Support of Motion for Summary Judgment as though fully set forth herein.

**PC2.**  Kristen Lindner was employed by CitiMortgage, Inc. August 1, 2010 through April 30, 2011.    Friedman Dec., Ex. 5, Defendant CitiMortgage, Inc.'s Amended Objections and Responses to Plaintiff's First Set of Requests for Admissions, Amended Response to Request for Admission No. 2.

**PC3.**  As part of her employment, Ms. Lindner notarized documents on behalf of CitiMortgage, including from December 2010 through February 2011. *Id*., Amended Response to Request for Admission Nos. 8, 9; Friedman Dec., **Exhibit 6**, Defendant CitiMortgage, Inc.'s Objections and Responses to Plaintiff's First Set of Requests for Admissions, Response to Request for Admission No. 7.

**PC4.**  CitiMortgage had a business policy of maintaining copies of the notary logs of its notary employees for those documents notarized on behalf of CitiMortgage, which it collected on a weekly basis.    Friedman Dec., **Exhibit 7**, Document Execution – CitiMortgage (CITI-KESTER-000971-1007).

**PC5.**  Ms. Lindner kept a notary log of the documents she notarized on behalf of CitiMortgage. Friedman Dec., Ex. 1.

**PC6.**  Ms. Lindner's notary log entries for the Assignment of Deed of Trust and Substitution of Trustee suffer from the same deficiencies as those identified in the December 6, 2010 letter from the ASO – which resulted in a determination that Ms. Lindner failed to clearly show that she identified the signer or that that signer was present with her for the notarization, and therefore "failed to properly perform the acknowledgment and executed a notarial certificate containing a false statement providing the Secretary grounds for suspension or revocation." Friedman Dec., Ex. 1; Doc. 104-1, Ex. O.

**PC7.**  On September 29, 2010, the AGO sent Ms. Lindner a letter informing her that Ryan Safar had filed a complaint against her in connection with her notarization of

certain documents.  Doc. 104-1. Ex. I.  The letter included a copy of Mr. Safar's complaint where he alleged that Ms. Lindner notarized a Substitution of Trustee and Assignment of Deed of Trust on April 2, 2010 even though the signer could not have been in Arizona to sign the documents in Ms. Lindner's presence. *Id*., Ex. H. The September 29, 2010 letter also clearly and unequivocally informed Ms. Lindner that her notary commission could be revoked if she failed to provide the requested information to the AGO within 10 business days.  *Id*.

**PC8.**  On October 11, 2010, Ms. Lindner sent the AGO the documents requested in their September 29, 2010 letter.  Doc. 104-1, Ex. K.

**PC9.**  On November 23, 2010, Ms. Lindner emailed Mr. Stanford, at the AGO asking whether the AGO had received her October 11, 2010 letter.  Doc. 104-1, Ex. N.

**PC10.** On November 23, 2010, Mr. Stanford confirmed the AGO had received Ms. Lindner's October 11, 2010 response to the complaint and let her know "You will hear from the Secretary of State's Office regarding its decision about the complaint," thereby inferring that nothing further was required from Ms. Lindner and a decision on the complaint would be issued soon. *Id*.

**PC11.** A copy of the December 6, 2010 letter from the ASO informing Ms. Lindner that her notary commission had been revoked effective December 6, 2010 was sent to the AGO and the "Notary File," and there is nothing in the record indicating that this was not done immediately after the letter was issued.  Doc. 104-1, Ex. O.

**PC12.** On June 9, 2011, the ASO informed Ms. Lindner that "[i]t has been brought to the attention of the Office of the Secretary of State, that you notarized a "Deed of Trust" on January 12, 2011," and demanding she "cease notarizing immediately, as your notary commission was revoked on December 6, 2010 due to your failure to fully and faithfully discharge the duties of a notary public."  Friedman Dec., Ex. 2.

**PC13.** It is important in the mortgage servicing industry to understand the laws that govern your business and comply with them.  Friedman Dec., Ex. 3, Murphy Trans., at

29:5-17.  This includes ensuring that any notary acts done on your behalf by a notary employee comply with applicable laws.  *Id*. at 83:5-13, 84:10-21.

**PC14.** The industry typically has policies, procedures, and practices in place to help ensure compliance with applicable laws.  Friedman Dec., Ex. 3, Murphy Trans., at 30:15-21, 31:8-20.  These policies, procedures and practices have to be complied with, but are not the same as regulations.  *Id*. at 31:21-32:15.

**PC15.** If state law has specific requirements for what needs to be included in an acknowledgement, entities such as Defendants would typically develop practices to ensure compliance with those requirements.  Friedman Dec., Ex. 3, Murphy Trans., at 98:10-99:7.  These types of practices are not necessarily laid out in the laws or regulations they are designed to help ensure compliance with.  *Id*. at 99:8-14.

**PC16.** The industry has also developed policies, procedures, and practices pertaining to operations that are not required by or directly related to laws, regulations, or regulatory guidance or expectations.  Friedman Dec., Ex. 4, Wyatt Trans., at 50:16-51:19 ("if you're a mortgage servicer, you put in place policies and procedures related to the activities or operations of your business, although there may not be regulatory -- specific regulatory requirements in connection with a policy or procedure that require such a policy and procedure"); *see also* Ex. 3, Murphy Trans., at 34:12-24.

**PC17.** Entities such as Defendants can have practices in place that they determine to be reasonable even without an "industry standard" requiring them.  Friedman Dec., Ex. 3, Murphy Trans., at 97:2-8.  They can have practices in place that they define as prudent for their operations without an "industry standard" requiring them.  *Id*. at 97:9-17.  They can also have practices in place based on the risks they operate under without an "industry standard" requiring those practices.  *Id*. at 97:18-98:1.

**PC18.** Absent an applicable law or regulation, CitiMortgage itself is responsible for determining what steps are reasonable with respect to following up on complaints made against their notary employees.  Friedman Dec., Ex. 3, Murphy Trans., at 214:1-215:13.

17

**PC19.** It is important in the mortgage servicing industry that their notaries have valid commissions. Friedman Dec., Ex. 3, Murphy Trans., at 120:13-22.   It was an expectation in the industry long before 2010 that if a complaint was filed against a notary or there was an investigation with respect to a notary, that it would be brought to the attention of the notary's manager for follow up.   *Id*. at 122:23-123:7. Complaints against or investigations into notary employees would not be ignored because at some point they could affect the notary's ability to do their job.   *Id*. at 124:5-12, 124:19-125:18. For the same reason, entities such as CitiMortgage would want to know whether a notary employee's commission was suspended or revoked.   *Id*. at 138:12-139:10.

**PC20.** In 2010, various mortgage servicers had policies and procedures that related to notaries, including monitoring notaries, and checking the requirements for notaries, including regularly reviewing whether they had commissions and if those commissions were valid and up to date.   Friedman Dec., Ex. 4, Wyatt Trans., at 49:23-52:9, 53:9-18.

**PC21.** Defendant CitiMortgage, Inc. had policies and procedures in place in 2010 requiring its notaries to advise CitiMortgage of complaints concerning notary activities they performed on behalf of CitiMortgage.   Friedman Dec., Ex. 5, Amended Response to Request for Admission No. 15.

**PC22.** Defendant CitiMortgage, Inc. had policies and procedures in place in 2010 requiring its notaries to advise CitiMortgage of communications that involved a challenge to a notarized document, anything concerning CitiMortgage, Inc. or CR Title Services, Inc., or the status of the notary's commission or qualifications.   Friedman Dec., Ex. 5., Amended Response to Request for Admission No. 16.

**PC23.** CitiMortgage instituted these policies and procedures regarding complaints against notaries and challenges to notarized documents even though there was no law, regulation, or "industry standard" requiring them.   Friedman Dec., Ex. 3, Murphy Trans., at 196:13-197:3.

**PC24.** CitiMortgage's employees should follow CitiMortgage's policies and

18

procedures.  Friedman Dec., Ex. 3, Murphy Trans., at 32:3-15.

**PC25.** As required under CitiMortgage's policies and procedures, on or about September 29, 2010, Ms. Lindner advised her manager at CitiMortgage that a complaint was lodged against her as a notary public by Mr. Safar.  Friedman Dec., Ex. 5, Amended Response to Request for Admission No. 14.

**PC26.** Because CitiMortgage had policies and procedures in place in 2010 requiring its notaries to advise CitiMortgage of communications that involved a challenge to a notarized document or the status of the notary's commission or qualifications, Ms. Lindner was required to advise CitiMortgage of her October 11, 2010 letter to the ASO and her November 23, 2010 email exchange with Mr. Stanford.  Friedman Dec., Ex. 5, Amended Response to Request for Admission No. 16.  Given that Ms. Lindner notified her manager of the September 29, 2010 letter, it is reasonable to infer that she also informed CitiMortgage about her October 11, 2010 letter to the AGO and her November 23, 2010 email exchange with Mr. Stanford, and later about the January 14, 2011 letter, and either provided copies to CitiMortgage or explained the contents. *Id*.

**PC27.** It is thus reasonable to infer that around September 29, 2010, CitiMortgage knew the nature of the complaint, and that a timely response to the September 29, 2010 letter was required to avoid the risk of revocation of Ms. Lindner's notary commission due to a simple failure to respond, and knew around November 23, 2010 that the investigation was complete and a decision from the ASO was forthcoming.  *Id*.

**PC28.** Because Mr. Safar's complaint identified the documents at issue, the signer (Richard Martinez, another CitiMortgage employee), and the date the documents were notarized, CitiMortgage could have checked directly whether there was any validity to Mr. Safar's complaint that Ms. Lindner and the signer could not have been in the same place when the documents were notarized. *Id*.

**PC29.** Given that a copy of the December 6, 2010 letter from the ASO was sent to the AGO and to the "Notary File," had CitiMortgage contacted the ASO or the AGO after

December 6, 2010, it is reasonable to infer they would have learned that Ms. Lindner's commission was revoked December 6, 2010.  Doc. 104-1, Ex. O.

**PC30.** Complaints against a notary employee should be taken seriously by mortgage servicers such as CitiMortgage because the notary is notarizing documents on behalf of CitiMortgage.  Friedman Dec., Ex. 4, Wyatt Trans., at 63:16-64:21.

**PC31.** Mortgage servicers such as CitiMortgage would want to know the results of any complaints or investigations of their notary employees because it could affect the notary's ability to do their job.  Friedman Dec., Ex. 3, Murphy Trans., at 124:19-125:18, 138:12-139:10.

**PC32.** Prudent mortgage industry standards dictate that mortgage servicers should not rely solely upon written notification or communications from the ASO concerning the results of a complaint, suspension, or revocation of a notary's commission in view of the fact that the issue is serious enough to warrant greater oversight and because such notifications or communications may be lost, ignored, overlooked, or purposely not brought to the immediate attention of the appropriate management responsible for monitoring such communication.  Doc. 104-1, Ex. T, p. 3.

**PC33.** Once CitiMortgage was notified of the complaint and investigation against its employee, Ms. Lindner, it should have raised a red flag triggering action on CitiMortgage's part to affirmatively investigate the complaint.  Friedman Dec., Ex. 4, Wyatt Trans., at 60:17-61:15; *see also* Ex. 3, Murphy Trans., at 128:9-129:7 (if a complaint is made against one of CitiMortgage's notary employees, it would be reasonable for CitiMortgage to do their own investigation into the complaint).

**PC34.** Under reasonably prudent practices and standards, CitiMortgage should also have discontinued allowing Ms. Lindner to notarize any documents on its behalf until a final decision was made by the ASO in connection with the pending complaint, and CitiMortgage should have monitored the status of the investigation into Ms. Lindner's Notary commission through the ASO. Doc. 104-1, Ex. T, at pp. 5, 6-7; Friedman Dec., Ex.

4, Wyatt Trans., at 64:25-66:1; 69:8-12; *see also* Friedman Dec., Ex. 3, Murphy Trans., at 229:24-230:20 (Defendants' expert admits that it would have been reasonable for CitiMortgage to "take the conservative approach" and monitor Ms. Lindner's work once they learned about the complaint against her).

PC35. Once CitiMortgage knew that a complaint was filed against Ms. Lindner, it was also reasonable and prudent for CitiMortgage to independently investigate the nature of the complaint and diligently monitor the status of the complaint to learn about any determinations made by the ASO with respect to the complaint. Friedman Dec., Ex. 4, Wyatt Trans., at 63:16-64:21; *see also* Ex. 3, Murphy Trans., at 122:23-123:7, 124:5-12, 124:19-125:18, 128:9-129:7, 138:12-139:10 (there was an expectation in the mortgage servicing industry that if a complaint was filed against a notary or there was an investigation with respect to a notary, that that would be brought to the attention of the notary's manager; that it would be reasonable for the servicer to do their own investigation; and that mortgage servicers would want to know the results of any such complaints or investigations because it could affect the notary's ability to do their job.)

PC36. Any monitoring guidelines CitiMortgage had in place which applied to all of their notary employees – for example, checking the status of the notary's commission every thirty (30) days – needed to be escalated once CitiMortgage was informed that a complaint had been filed against one of their notaries, Ms. Lindner. Doc. 104-1, Ex. T, p. 6; Friedman Dec., Ex. 4, Wyatt Trans., at 81:17-82:8.

PC37. Checking the status of Ms. Lindner's notary commission weekly was reasonable once CitiMortgage knew a complaint had been filed against Ms. Lindner. Friedman Dec., Ex. 3, Murphy Trans., at 230:21-232:9 (checking on the status of the investigation regarding Ms. Lindner on a weekly basis was a reasonable option for CitiMortgage to choose). The same would be true with respect to any other CitiMortgage notary that had a complaint filed against them with respect to their notarization of documents for CitiMortgage. *Id*.

1     **PC38.** Despite the revocation of her notary commission on December 6, 2010,

2    Defendants allowed Ms. Lindner to continue notarizing documents on behalf of

3    CitiMortgage for approximately three (3) months after her notary commission was

4    revoked.  Friedman Dec., Ex. 5, Amended Responses to Request for Admission Nos. 2, 4,

5    8-9; Ex. 6, Response to Request for Admission No. 7.

6     **PC39.** Ms. Murphy uses the phrase "industry standard" throughout her Rebuttal

7    Report.  Doc. 104-1, Ex. U.  When Ms. Murphy uses the terms "industry standard" or

8    "standard," she is referring solely to published, written requirements dictated by regulatory

9    guidance or defined by someone who is responsible for the industry, primarily regulators

10    as a standard the mortgage servicing industry is required to follow. Friedman Dec., Ex. 3,

11    Murphy Trans., at 80:6-81:13, 90:2-92:24, 94:6-15, 223:5-226:14.

12     **PC40.** According to Mr. Wyatt, industry standards are not limited to what the law

13    or regulations require a mortgage servicer to do.  Friedman Dec., Ex. 4, Wyatt Trans., at

14    63:16-64:21.  Once a mortgage servicer knows a complaint has been filed against one of

15    their notaries in connection with documents notarized on behalf of the servicer, the

16    reasonable and prudent practice in the mortgage servicing industry would be to treat the

17    complaint seriously, investigate the complaint – including the allegations and any legal

18    requirements, and also be diligent in independently determining the status of the complaint,

19    and any decisions made or actions taken by the ASO in connection with the complaint.  *Id*.

20     **PC41.** Mr. Wyatt's opinions are based on his 30 plus years of relevant experience

21    in the banking and mortgage servicing industry, including thirteen years working in the

22    litigation department at Bank United and its predecessor (1987-2001), nine years at Litton

23    Loan Servicing LP, first as the litigation manager then Assistant Vice President, then Vice

24    President Litigation and Executive Resolution (2001-April 2010), and has been the

25    principal at Wyatt Consulting Services since May 2010.  Friedman Dec., Ex. 4, Wyatt

26    Trans., 15:16-23, 16:20-17:4, 27:1-14, 29:10-14.

27     **PC42.** Ms. Murphy is not opining on Defendants' actual policies, procedures, or

28

practices; is not opining on what policies, procedures or practices may have existed in the

mortgage servicing industry in 2010; is not opining that the actions Mr. Wyatt opined

Defendants should have taken in response to the complaint against Ms. Lindner were not

reasonable or prudent; and is limiting her testimony regarding whether it was reasonable

for Defendants to wait rather than investigate or monitor the complaint against Ms. Lindner

on the alleged lack of laws, regulations, or "industry standards" prohibiting Defendants

from just waiting to hear from the ASO.  Friedman Dec., Ex. 3, Murphy Trans., at 200:2-

23, 214:1-216:18 (*i.e.*, "My opinion was whether what he suggested were industry

standards, whether they were, in fact, industry standards"), 221:21-223:9, 224:19-229:5.

DATED this 8th day of May, 2019.

**BONNETT, FAIRBOURN, FRIEDMAN**
**& BALINT, P.C.**

By: s/Andrew S. Friedman
Andrew S. Friedman, Esq. (005425)
Nada Djordjevic (*admitted pro hac vice*)
2325 East Camelback Road, Suite 300
Phoenix, Arizona 85016
afriedman@bffb.com
ndjordjevic@bffb.com
Telephone: (602) 274-1100

Patricia N. Syverson, Esq. (AZ 020191)
**BONNETT FAIRBOURN FRIEDMAN**
**& BALINT, P.C.**
600 W. Broadway, Suite 900
San Diego, CA 92101
psyverson@bffb.com
Telephone: (619) 798-4593

David N. Lake (*admitted pro hac vice*)
**LAW OFFICES OF DAVID N. LAKE,**
**A Professional Corporation**
16130 Ventura Boulevard, Suite 650
Encino, California 91436
david@lakelawpc.com
Telephone: (818) 788-5100
Facsimile: (818) 788-5199

*Attorneys for Plaintiff*

23

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I, Trish Aquilino, hereby certify that a true copy of the foregoing document filed through the ECF system will be electronically sent to the registered participants as identified on the Notice of Electronic Filing, and paper copies will be sent to those indicated as non-registered participants on May 8, 2019.

*/s/Trish Aquilino*