**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| David A Kester,<br><br>　　　　Plaintiff,<br><br>v.<br><br>CitiMortgage Incorporated, et al.,<br><br>　　　　Defendants. | No. CV-15-00365-PHX-DLR<br><br>**ORDER** |

At issue is a motion for summary judgment filed on behalf of Defendants CitiMortgage Incorporated ("Citi") and CR Title Services Incorporated ("CR"),[1] which is fully briefed. (Docs. 103, 122, 124.) For the following reasons, Defendants' motion is granted.[2]

**I. Background**[3]

Plaintiff David Kester owned real property in Chandler, Arizona. Citi was the beneficiary of a deed of trust securing repayment of Kester's home loan, and CR was the trustee under that deed of trust.

---

[1] After this case was filed, CR merged with CFNA Receivables (TX), LLC. For ease and consistency, the Court will continue referring to this entity as CR.

[2] Oral argument is denied because the issues are adequately briefed and oral argument will not be useful. *See* Fed. R. Civ. P. 78(b); LRCiv. 7.2(f).

[3] The Court discusses only essential exposition and information material to the motion. The Court does not discuss disputes over immaterial matters, nor does it consider non-responsive paragraphs and legal arguments impermissibly raised in separate and controverting statements of facts. *See Hunton v. Am. Zurich Ins. Co.*, No. CV-16-539-PHX-DLR, 2018 WL 1182552 (D. Ariz. Mar. 7, 2018) (explaining how separate and controverting statements of facts often are misused).

On December 16, 2010, Citi executed two documents related to Kester's property: (1) an Assignment of Deed of Trust ("Assignment"), which purported to transfer all beneficial interest in the deed of trust from Citi's predecessor in interest to Citi, and (2) a Substitution of Trustee ("Substitution"), which substituted CR as the trustee under the deed of trust. Both documents were notarized by Kristin Lindner on December 16, 2010, and publicly recorded the following day.

Linder's notary commission, however, had been revoked by the Arizona Secretary of State's Office ("Secretary") on December 6, 2010—ten days before Lindner notarized the documents and eleven days before they were recorded. The revocation stemmed from a complaint submitted to the Secretary in August 2010, which raised concerns about Lindner's notarization of documents related to the complainant's mortgage. The Arizona Attorney General's Office ("AG") informed Lindner on September 29, 2010, that a complaint had been filed against her, and Lindner advised Citi of the complaint around this same time.

On December 6, 2010, after receiving Lindner's written response to the complaint and some requested documentation, the Secretary mailed a letter to Lindner stating that her notary commission had been revoked and that she had thirty days in which to file a written notice of appeal. Copies of the letter were not sent to Defendants, and on January 14, 2011, the letter that was sent to Lindner was returned to the Secretary marked "UNCLAIMED – UNABLE TO FORWARD." That same day, the Secretary sent a new letter to Lindner's business address. This new letter stated that the Secretary had decided to revoke Lindner's notary commission effective immediately, and that Lindner had thirty days in which to file a written notice of appeal. This letter was delivered and received on January 18, 2011.

Kester filed this action in early 2015. The operative complaint accuses Defendants of violating A.R.S. § 33-420(A), which states:

> A person purporting to claim an interest in, or a lien or encumbrance against, real property, who causes a document asserting such a claim to be recorded in the office of the county recorder, knowing or having reason to know that the document is forged, groundless, contains a material misstatement or false claim or is otherwise invalid is liable to the owner or beneficial

> title holder of the real property for the sum of not less than five thousand dollars, or for treble the actual damages caused by the recording, whichever is greater, and reasonable attorney fees and costs of the action.

Kester claims that the documents Citi executed on December 16, 2010, were invalid because they were not properly notarized, and that Defendants violated § 33-420(A) by recording them the next day.

**II. Legal Standard**

Summary judgment is appropriate when there is no genuine dispute as to any material fact and, viewing those facts in a light most favorable to the nonmoving party, the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the case, and a dispute is genuine if a reasonable jury could find for the nonmoving party based on the competing evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002). Summary judgment may also be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Id*. at 323. The burden then shifts to the non-movant to establish the existence of a genuine and material factual dispute. *Id*. at 324. The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," and instead "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (internal quotation and citation omitted).

**III. Analysis**

1  Section 33-420(A) aims to protect property owners from clouded titles "by proscribing the recording of various types of invalid property claims." *Bergdale v. Quality Loan Serv. Corp.*, 3:16-cv-08198-JWS, 2017 WL 373014, at *2 (D. Ariz. Jan. 26, 2017). Where, as here, a property owner claims that a recorded document is invalid due to procedural deficiencies, "the recording party is liable if (1) the document is invalid and (2) the defendant knew or should have known this." *Id.* Defendants argue that Kester's claim fails on this second element because Kester cannot show Defendants knew or should have known that the Assignment and Substitution were invalid when they recorded them on December 17, 2010. The Court agrees.

There is no evidence from which a jury reasonably could find that Defendants *actually* knew at the time they recorded the Assignment and Substitution that Lindner's notary commission had been revoked. It is undisputed that Defendants were not sent and did not receive copies of the December 6, 2010 letter notifying Lindner of the revocation. Nor is there evidence that Lindner actually received the letter. Rather, the December 6 letter was returned to the Secretary unclaimed.[4] Although the Secretary of State's Office sent a new letter to Lindner in January 2011, that letter was sent and received well after Defendants had already recorded the Assignment and Substitution. Accordingly, Defendants did not have actual knowledge that the Assignment and Substitution were invalid at the time these documents were recorded.

Notwithstanding their lack of actual knowledge, Defendants could be liable under § 33-420(A) if they had reason to know on December 17, 2010, that the Assignment and Substitution were invalid. For purposes of § 33-420(A):

> "Reason to know" means that the actor has knowledge of facts
> from which a reasonable man of ordinary intelligence or one

---

[4] Moreover, even if Lindner had received the letter, her knowledge cannot be imputed to Defendants. Although an agent's knowledge generally may be imputed to a corporate principal, the Arizona Supreme Court rejected this principle in the specific context of § 33-420(A). *Wyatt v. Wehmueller*, 806 P.2d 870, 873-74 (Ariz. 1991) ("[I]mputed knowledge . . . is not what the statute intended when it used the words 'knowing or having reason to know,'" and "is not enough for damages to be imposed under §33-420(A)."). Indeed, the Court previously rejected Kester's imputed knowledge theory when ruling on Defendants' motion to dismiss (Doc. 37 at 18), and that determination was not disturbed by the Ninth Circuit's decision remanding this case.

> of the superior intelligence of the actor would either infer the existence of the fact in question or would regard its existence as so highly probable that his conduct would be predicated upon the assumption that the fact did exist.

*Coventry Homes, Inc. v. Scottscom P'Ship*, 745 P.2d 962, 966 (Ariz. Ct. App. 1987) (quoting Restatement (Second) of Torts § 12(1) (1965)). Defendants contend they could not reasonably have inferred that Lindner's notary commission had been revoked based on the facts known to them as of December 17, 2010. The Court agrees.

As of December 17, 2010, Defendants knew that a complaint had been submitted to the Secretary raising concerns about Lindner's notarization of mortgage-related documents, and that Lindner had responded to that complaint. Defendants therefore knew it was *possible* that Lindner's notary commission could be revoked *at some point*. But knowing that revocation was possible at some indeterminate date is a far cry from knowing on December 17, 2010, that Lindner's notary commission already had been revoked. Indeed, nothing in Arizona law precludes a notary from notarizing documents after a complaint as been filed or while an investigation of such a complaint is pending. Notaries instead are permitted to serve "until the notary public's commission expires, the notary public resigns the commission, the notary public dies or the secretary of state revokes the commission." A.R.S. § 41-312(D). Defendants therefore could not reasonably infer that Lindner's commission had been revoked prior to December 17, 2010, simply because a complaint had been filed and was being investigated.[5]

In arguing otherwise, Kester relies on the report and testimony of Christopher Wyatt who, based on his experience working in the mortgage origination and service industry, opined that Citi should have independently monitored the Secretary's investigation into the complaint against Lindner.[6] Wyatt bases his opinion on his experience working for several

---

[5] Kester does not argue that every complaint against a notary eventually results in revocation of that notary's commission, nor could he. By way of analogy, civil complaints are filed with this Court on a daily basis. That a defendant is the subject of a civil complaint does not mean that the defendant eventually will be found liable. It would be unreasonable to infer that a defendant is liable simply because a plaintiff has filed a complaint in court. Likewise, it would be unreasonable to infer that Lindner's notary commission had already been revoked simply because a complaint had been filed against her.

[6] Wyatt also opined that a reasonably prudent mortgage servicer would have

mortgage servicers that, during the relevant time, had instituted policies of independently monitoring the status of such notary investigations every thirty days.

But Wyatt's opinion, even if credited by a jury, cannot reasonably support the inference that Defendants should have known on December 17, 2010, that Lindner's notary commission had been revoked.[7] Indeed, Wyatt himself acknowledged during his deposition that Defendants would not necessarily have learned Lindner's notary commission had been revoked prior to December 17, 2010, even if they had instituted a monthly independent verification process:

> Q. . . . If [Citi's] policy was to check it on the 1st of every month—hypothetical—and they checked it on December 1st of 2010, it would not have caught her revocation here that occurred on December 6th, correct?
>
> A. Correct.
>
> Q. And the same would be true for December 2nd, 3rd, and 4th, correct?
>
> A. Correct.
>
> Q. And the 5th, correct, because the revocation hadn't occurred yet?
>
> A. Correct.
>
> Q. And this also assumes that the [Secretary's] website or their internal records, if you called, were updated timely, correct?
>
> A. That's correct.
>
> Q. But we don't know—or you don't know how frequently it was updated, correct?
>
> A. That's correct.

---

suspended using the services of a notary against whom a complaint had been filed until that complaint was resolved. But this opinion, even if credited by a jury, misses the mark. This is not a negligence case. Kester has not sued Defendants for breaching a duty of care. This is a statutory action for violation of § 33-420(A). Nothing in § 33-420(A) prohibits mortgage servicers from utilizing the services of a notary against whom a complaint has been filed, and nothing in Arizona law precludes a notary from providing notary services after a complaint has been filed and while such a complaint is being investigated. Whether, as a matter of caution or best practices, Defendants should have used a different notary is not probative of whether Defendants should have known on December 17, 2010, that Lindner's commission had, in fact, been revoked.

[7] For this reason, the Court need not decide whether Wyatt's opinion is admissible under Federal Rule of Evidence 702.

(Doc. 104-1 at 198-99.)

For Kester to prevail on this theory, a jury would need to make two critical assumptions: (1) that it was standard practice in the mortgage servicing industry to independently verify the status of such notary investigations *between the 6th and 17th of each month* and (2) that it was the Secretary's practice to update information about notary commission revocations within a similar timeframe. But there is no evidence of such an industry standard. Wyatt identified no mortgage servicer that independently monitored notary investigations more frequently than every thirty days, much less that monitored them specifically between the 6th and 17th of each month. And Kester has no evidence about how quickly the Secretary updates publicly available notary records after revoking a notary's commission.[8] Consequently, a jury hearing this evidence could only speculate as to whether the type of independent verification process Wyatt endorsed would have put Defendants on notice of Lindner's notary commission revocation before they recorded the offending documents.

**IV. Conclusion**

Defendants did not actually know Lindner's notary commission had been revoked prior to December 17, 2010. At bottom, Lindner argues that Defendants should have known that Lindner's notary commission had been revoked because a complaint had been filed against her and was being investigated by the Secretary. But a jury could not reasonably draw this inference without speculating. Defendants therefore are entitled to summary judgment because Kester cannot establish that Defendants knew or should have known that the Assignment and Substitution were invalid at the time Defendants recorded these documents.

//

//

---

[8] Kester argues there is no evidence that public records were *not* contemporaneously updated, but this argument impermissibly shifts the burden of proof. Defendants do not bear the burden of proving a negative. It is Kester who must supply sufficient evidence that would permit a jury to infer Defendants should have known on December 17, 2010, that Lindner's notary commission has been revoked. He cannot blame Defendants for evidentiary holes that he is responsible for filling.

1     **IT IS ORDERED** that Defendants' motion for summary judgment (Doc. 103) is
2 **GRANTED**. The Clerk of the Court is directed to deny as moot all remaining motions,
3 terminate any remaining deadlines and hearings, enter judgment in favor of Defendants,
4 and terminate this case.
5     Dated this 24th day of September, 2019.

                                        Douglas L. Rayes
                                        United States District Judge